IN THE MATTER OF GRAND JURY PROCEEDINGS OF JOSEPH GUARINO.

Argued February 4, 1986—Decided October 15, 1986.

*Nancy L. Singer,* Deputy Attorney General, argued the cause for appellant State of New Jersey (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*Robert L. Sloan* argued the cause for respondent Joseph Guarino (*James Logan, Jr.,* attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the questions whether, and to what extent, the voluntarily-prepared business records of a sole proprietor are privileged against compelled self-incrimination—first, under the Fifth Amendment of the United States Constitution, U.S. Const., Amend. V, and second, under the laws of New Jersey.

I

The relevant facts in this case are undisputed. Since 1959, respondent, Joseph Guarino, has been doing business as a sole proprietor under the name of Green Acres Estates, a real estate concern. In 1984, a state Grand Jury began an investigation of

Green Acres Estates. During the course of that investigation, the Grand Jury served Guarino with a *subpoena duces tecum.* The subpoena directed him to produce the records listed on an attached schedule that read as follows:

For the period January 1, 1970 to present, the following records pertaining to real property sold by Joseph Guarino, doing business as Green Acres Estates.

1) all contracts for the sale of real estate (including conditional land sales contracts) by or on behalf of Joseph Guarino d/b/a Green Acres Estates, seller-grantor, in Burlington County and Cumberland County (regardless of whose signature appears on behalf of the seller);

2) cash receipts journal and general ledger recording all payments made by purchasers/grantees of property from Joseph Guarino d/b/a Green Acres Estates in Cumberland and Burlington Counties (whether payments are complete or ongoing; whether or not the deed has been transferred);

3) all payment coupons or other documentation which reflect and record payments made by purchasers/grantees of property from Green Acres Estates in Burlington and Cumberland Counties.

Guarino moved to quash the subpoena. The trial court ruled that the motion was untimely and ordered Guarino to appear before the Grand Jury.

In June 1984, Guarino did appear. Relying on his Fifth Amendment privilege against self-incrimination, he refused to *produce* the documents listed in the subpoena. Shortly thereafter upon application by the Attorney General, the trial court entered an order pursuant to *N.J.S.A.* 2A:81–17.3,[1] compelling Guarino to *produce* the documents and immunizing him from:

---

[1]*N.J.S.A.* 2A:81–17.3, in relevant part, provides:

In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order. After complying and if but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, such testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, may not be used against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order.

the use of the evidence against him *of the act of production* of said records in any proceeding or prosecution for a crime or offense, concerning matters arising out of the act of production of the records produced under order of the court pursuant to the provisions of *N.J.S.A.* 2A:81–17.3 (emphasis added.)

Guarino filed another motion to quash, arguing that use against him of the *contents* of the subpoenaed documents violated his privilege against self-incrimination under both the Fifth Amendment to the United States Constitution and the laws of New Jersey. Relying on the authority of the United States Supreme Court decision in *United States v. Doe,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984), the trial judge denied the motion. He stated that in the absence of a clear mandate from this Court he was reluctant to decide that the New Jersey privilege against self-incrimination was broader than that provided by the United States Constitution. He ordered Guarino to comply with the subpoena; however, that order was stayed pending appeal.

On March 28, 1985, the Appellate Division issued a *per curiam* decision reversing the trial court's order. We granted the State's petition for certification. 101 *N.J.* 306 (1985).

II

■ We first examine whether, and to what extent, the Fifth Amendment privilege against self-incrimination applies to voluntarily-prepared business records of a sole proprietor. The constitutional privilege against self-incrimination is "essentially a personal one, applying only to natural individuals." *United States v. White,* 322 *U.S.* 694, 698, 64 *S.Ct.* 1248, 1251, 88 *L.Ed.* 1542, 1546 (1944). "[A]n individual cannot rely upon the privilege to avoid producing the records of a collective entity which are in his possession in a representative capacity, even if these records might incriminate him personally." *Bellis v. United States,* 417 *U.S.* 85, 88, 94 *S.Ct.* 2179, 2183, 40 *L.Ed.*2d 678, 683

[*L.* 1968, *c.* 195, § 1, eff. July 19, 1968. Amended by *L.* 1973, *c.* 112, § 1, eff. May 7, 1973.]

(1974). Consequently, the privilege cannot be asserted by a collective group (such as a corporation or a union) or by a representative employee or agent of that collective group. *See Wilson v. United States,* 221 *U.S.* 361, 31 *S.Ct.* 538, 55 *L.Ed.* 771 (1911) (corporation and its officers); *United States v. White,* 322 *U.S.* 694, 64 *S.Ct.* 1248, 88 *L.Ed.* 1542 (1944) (labor union); *McPhaul v. United States,* 364 *U.S.* 372, 380, 81 *S.Ct.* 138, 143, 5 *L.Ed.*2d 136, 143 (1960) (political organization); *Rogers v. United States,* 340 *U.S.* 367, 71 *S.Ct.* 438, 95 *L.Ed.* 344 (1951) (political party); and *Bellis v. United States,* 417 *U.S.* 85, 94 *S.Ct.* 2179, 40 *L.Ed.*2d 678 (1974) (partnership).

Employing this principle, the Supreme Court in two recent cases, *Fisher v. United States,* 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (1976) and *United States v. Doe,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984), has substantially limited the application of the Fifth Amendment privilege to business records, including those possessed by sole proprietors. Since *Boyd v. United States,* 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746 (1886) but prior to *Fisher,* the Supreme Court in a series of opinions consistently had repeated the axiom that an individual's private papers were protected by the Fifth Amendment from compelled disclosure. *See Fisher,* 425 *U.S.* at 419–20, 96 *S.Ct.* at 1585–86, 48 *L.Ed.*2d at 61 (Brennan, J., concurring.) The prevailing rule was that "the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony." *Bellis,* 417 *U.S.* at 87, 94 *S.Ct.* at 2182, 40 *L.Ed.*2d at 683.[2] The protection of personal privacy, the fear that private thoughts recorded on paper might become the object of criminal sanctions, was the most prevalent

---

[2]This principle stems from English common law. *See In re Grand Jury Proceedings (Johanson),* 632 *F.*2d 1033, 1043–44 (3d Cir.1980). The U.S. Supreme Court first recognized the privilege in 1886 in *Boyd v. United States,* 116 *U.S.* 616, 630, 6 *S.Ct.* 524, 532, 29 *L.Ed.* 746, 751 (1886): "Any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of a crime" violates the Fifth Amendment. *Id.*

rationale for this rule. And the privilege was viewed quite expansively, applying to the business records of the sole proprietor or sole practitioner as well as to the personal documents containing more intimate information about an individual's private life. *Bellis,* 417 *U.S.* at 87, 94 *S.Ct.* at 2182, 40 *L.Ed.*2d at 683; Note, "Organizational Papers and the Privilege Against Self-Incrimination," 99 *Harv.L.Rev.* 640 (1986).

In *Fisher* and then again in *Doe,* the Court departed from these precedents.[3] In *Fisher,* the Court held that a sole proprietor's tax records in the possession of his accountant were not protected. Justice White, writing in *Fisher* for himself and five other Justices, noted that "[s]everal of [the old] express or implicit declarations have not stood the test of time." *Fisher,* 425 *U.S.* at 407, 96 *S.Ct.* at 1579, 48 *L.Ed.*2d at 54. He stated that "the prohibition against forcing the production of private papers has long been a rule searching for a rationale consistent with the proscriptions of the Fifth Amendment against compelling a person to give 'testimony' that incriminates him." *Id.*

No longer constrained by the old rule, the *Fisher* Court fashioned a new one. The Court focused on the precise words of the Fifth Amendment—"[n]o person ... shall be *compelled* in any criminal case to be a *witness against himself.*" *Id.* at 396, 96 *S.Ct.* at 1574, 48 *L.Ed.*2d at 47 (emphasis in the original.) Rather than existing to shield certain private writings from discovery by the Government, the Fifth Amendment "applies only when the accused is *compelled* to make a *testimo-*

---

[3] A predecessor of *Fisher* was the Court's decision in *Couch v. United States,* 409 *U.S.* 322, 93 *S.Ct.* 611, 34 *L.Ed.*2d 548 (1973). In *Couch,* the Court held that Fifth Amendment rights of a sole proprietress were not violated by the enforcement of a documentary summons issued by the Internal Revenue Service to her accountant requiring production of the taxpayer's own records in the accountant's possession. The Court did so on the ground that no "Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused." 409 *U.S.* at 336, 93 *S.Ct.* at 619–20, 34 *L.Ed.*2d at 558.

*nial* communication that is incriminating." *Id.* at 408, 96 *S.Ct.* at 1579, 48 *L.Ed.*2d at 54 (emphasis added.) In effect, the focus of the Court shifted from privacy to the process of compulsion. *See id.* at 400, 99 *S.Ct.* at 1575–76, 48 *L.Ed.*2d at 50; *In re Grand Jury Empanelled Mar. 19, 1980,* 680 *F.*2d 327, 332 (3d Cir.1982); Note, "The Rights of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of Fisher v. United States," 95 *Harv.L.Rev.* 683, 683 (1982).[4]

Applying the new test to the facts of the *Fisher* case, the Court concluded that requiring a defendant-taxpayer to produce an accountant's workpapers in the taxpayer's possession would not violate the Fifth Amendment, regardless of how incriminating those papers might be to the taxpayer, because "the privilege protects a person only against being incriminated by his *own compelled testimonial communications.*" 425 *U.S.* at 409, 96 *S.Ct.* at 1580, 48 *L.Ed.*2d at 55. (Emphasis added.)

The accountant's workpapers were therefore in no sense testimonial communications, according to the Court, because the workpapers were not prepared by the taxpayer. Nor were they compelled communications because they were voluntarily prepared. *Id.* at 409–10, 96 *S.Ct.* at 1580–81, 48 *L.Ed.*2d at 55. The court wrote that:

A subpoena served on a taxpayer requiring him to produce an accountant's workpapers in his possession without doubt involves substantial compulsion. But it does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought. Therefore, the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer, for *the*

---

[4]The Court stated that:

The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another Amendment—the Fifth—to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination. [*Fisher,* 425 *U.S.* at 400, 96 *S.Ct.* at 1576, 48 *L.Ed.*2d at 50.]

> *privilege protects a person only against being incriminated by his own compelled testimonial communications.* [citations omitted.] The accountant's workpapers are not the taxpayer's. They were not prepared by the taxpayer, and they contain no testimonial declarations by him. Furthermore, as far as this record demonstrates, *the preparation of all of the papers sought in these cases was wholly voluntary,* and they *cannot be said to contain compelled testimonial evidence, either of the taxpayers or of anyone else.* (emphases added.)

The Court in *Fisher* recognized, however, that there were two situations where the act of producing evidence in response to a subpoena could have "communicative aspects of its own, wholly aside from the contents of the papers produced." *Fisher,* 425 *U.S.* at 410, 96 *S.Ct.* at 1581, 48 *L.Ed.*2d at 56. First, the act of producing documents in some instances might amount to an admission of the existence of such documents and their possession or control by the taxpayer. Second, the act of production might resemble the act of testimonial self-incrimination if responding to a subpoena would in some sense "authenticate" the documents produced. *See United States v. Beattie,* 522 *F.*2d 267, 270 (2d Cir.1975) (Friendly, J.) ("[a] subpoena demanding that an accused produce his own records is ... the equivalent of requiring him to take the stand and admit their genuineness"). Neither of these situations, however, was present in *Fisher.* Accordingly, the Court reiterated its conclusion that the Fifth Amendment did not prevent the Government from obtaining, through subpoena, an accountant's workpapers in the possession of a taxpayer or his attorney.

The Court subsequently employed the *Fisher* analysis in *U.S. v. Doe,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984), where the facts were virtually identical to those in this case. The respondent was a sole proprietor. He was served with five subpoenas during the course of a Grand Jury's investigation into corruption in the awarding of county and municipal contracts. The first two subpoenas demanded that he produce telephone records of several of his companies and all records pertaining to four of his banks. A third subpoena demanded

the production of a list of virtually all the business records of one of his companies.[5]

Respondent filed a motion in federal district court seeking to quash the subpoenas. The district court granted the motion, quashing all of the subpoenas except those that sought documents and records required by law to be kept or disclosed to a public agency. The Third Circuit affirmed. *In re Grand Jury Empanelled Mar. 19, 1980*, 541 *F.Supp.* 1 (D.N.J.1981), aff'd, 680 *F.*2d 327 (3d Cir.1982), rev'd sub. nom. *U.S. v. Doe*, 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984).

In its opinion in *Doe*, the Supreme Court first stated that *Fisher's* rationale applied with equal force to a sole proprietor who prepared his own documents. As in *Fisher*, the Court found that a subpoena that demands the production of documents does not *compel* oral testimony. Doe did not contend, said the Court, that he prepared the documents involuntarily or that the subpoena would force him to restate, repeat, or affirm the truth of their contents. The fact that the records were in Doe's possession, as opposed to his accountant's, was irrelevant in determining whether the creation of the record was compelled. The Court, therefore reversed the Third Circuit in part and concluded that the *contents* of the records were not privileged.

---

[5]The categories of records sought by the third subpoena were: 1) general ledgers; 2) general journals; 3) cash disbursement journals; 4) petty cash books and vouchers; 5) purchase journals; 6) vouchers; 7) paid bills; 8) invoices; 9) cash receipts journals; 10) billings; 11) bank statements; 12) cancelled checks and check stubs; 13) payroll records; 14) contracts and copies of contracts, including all retainer agreements; 15) financial statements; 16) bank deposit tickets; 17) retained copies of partnership income tax returns; 18) retained copies of payroll tax returns; 19) accounts payable ledger; 20) accounts receivable ledger; 21) telephone company statement of calls and telegrams, and all telephone toll slips; 22) records of all escrow, trust, or fiduciary accounts maintained on behalf of clients; 23) safe deposit box records; 24) records of all purchases and sales of all stock and bonds; 25) names and home addresses of all partners, associates, and employees; 26) W-2 forms of each partner, associate, and employee; 27) workpapers; and 28) copies of tax returns.

The Court, however, continued to draw the distinction that it drew in *Fisher* between the *contents* of a document and the act of producing it. *Doe*, 465 *U.S.* at 612–13, 104 *S.Ct.* at 1242, 79 *L.Ed.*2d at 560. But in *Doe*, unlike in *Fisher*, the Court had the explicit findings of the District Court that the act of producing the documents would invoke testimonial self-incrimination. Declining to overturn that finding because it rested on a determination of factual issues that had some support in the record, it affirmed the lower courts insofar as they found the act of production to be privileged. *Id.* at 614–15, 104 *S.Ct.* at 1243, 79 *L.Ed.*2d at 561. The Court recognized that if the government wished to compel production of the documents, it could have sought a grant of use immunity with respect to the potentially incriminating evidence, pursuant to 18 *U.S.C.* §§ 6002–03. *Id.* at 614–15, 617–18, 104 *S.Ct.* at 1243, 1244–45, 79 *L.Ed.*2d at 561, 563.

Following *Doe*, it is clear that the *contents* of business records, whether from a corporation, a partnership, or a sole proprietorship, are no longer privileged under the Fifth Amendment. The documents requested from the respondent in this case were far less extensive than those requested from Doe. The only request made of Guarino, doing business as Green Acres Estates, that was not made of Doe was for real estate contracts and documentation of real estate payments. Given the nature of Guarino's business, those contracts were clearly business, not personal, records, and they were related to the focus of the Grand Jury's investigation. Like Doe, Guarino does not contend that he prepared the requested records involuntarily or that the subpoena would force him to restate, repeat, or affirm the truth of the contents. Accordingly, under *Doe* the contents of respondent's business records are not protected by the Fifth Amendment privilege against self-incrimination. Furthermore, the prosecutors here, as the Supreme Court suggested in *Doe*, granted Guarino use immunity for *producing* the documents. Therefore, the production of the

documents did not violate his Fifth Amendment privilege against self-incrimination.

## III

We turn now to an examination of whether under independent principles of state law we might extend the privilege against self-incrimination to Guarino, doing business as Green Acres Estates. It is undisputed that State common law may provide greater protection to individual rights than afforded under the United States Constitution. *State v. Williams*, 93 *N.J.* 39 (1983); *State v. Hunt*, 91 *N.J.* 338, 353 (1982). In the past, we have held that the New Jersey common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege. *See State v. Vinegra*, 73 *N.J.* 484, 490 (1977) (recognizing that the New Jersey privilege as expressed in the "target doctrine seems to afford greater protection than that given by the Fifth Amendment."); *State v. Deatore*, 70 *N.J.* 100, 115–16 (1976) (holding as a matter of state law that a party's post-arrest silence could not be used to impeach his exculpatory alibi testimony at trial, even if federal law did not require this protection).

The privilege against self-incrimination "has been an integral thread in the fabric of New Jersey common law since our beginnings as a state." *State v. Hartley*, 103 *N.J.* 252, 286 (1986) (citing *State v. Fary*, 19 *N.J.* 431, 435 (1955)). *See also In re Martin*, 90 *N.J.* 295, 331 (1982); *In re Ippolito*, 75 *N.J.* 435, 440 (1978); *State v. Vinegra*, 73 *N.J.* 484, 488–89 (1977); *State v. Zdanowicz*, 69 *N.J.L.* 619, 622 (E. & A.1903). Although the privilege is expressly incorporated only in our rules of evidence, *N.J.S.A.* 2A:84A–17 to 84A–19 (Evid.R. 23, 24 and 25),[6] and is not written into our state constitution, " 'the com-

---

[6]The basic privilege under New Jersey law is defined in *N.J.S.A.* 2A:84A–17(1), Evidence Rule 23, as follows: "(1) Every person has in any criminal

mon law doctrine, unaltered by legislation or by law practice is by us deemed to have its full force. In New Jersey, no person can be compelled to be a witness against himself.' " *State v. Hartley,* 103 *N.J.* at 286 (quoting *State v. Zdanowicz,* 69 *N.J.L.* at 622).

Central to our state common-law conception of the privilege against self-incrimination is the notion of personal privacy first embodied in 1886 in *Boyd v. United States.* While still a member of this Court, Justice Brennan wrote: the "wide acceptance and broad interpretation [of the privilege] rests on the view that compelling a person to convict himself of a crime ... 'cannot abide the pure atmosphere of political liberty and personal freedom.' " *In re Pillo,* 11 *N.J.* 8, 15–16 (1952) (citing *Boyd v. United States,* 116 *U.S.* at 632, 6 *S.Ct.* at 533, 29 *L.Ed.* at 751.) [7] In his concurrence in *Fisher,* Justice Brennan eloquently expressed the essential meaning of the personal privacy doctrine expounded in *Boyd:*

> Expressions are legion in opinions of this Court that the protection of personal privacy is a central purpose of the privilege against compelled self-incrimination. "[I]t is the invasion of [a person's] indefensible right of personal security, personal liberty and private property" that constitutes the essence of the offense" that violates the privilege. *Boyd v. United States, supra,* at 630, 29

action in which he is an accused a right not to be called as a witness and not to testify." The remaining sections of *N.J.S.A.* 2A:84A–17 set forth the rules of evidence concerning (2) the privilege with respect to the testimony of a spouse and (3) the lack of a privilege regarding non-testimonial matters (*i.e.* body examinations). *N.J.S.A.* 2A:84A–18 and 19 defines the right against self-incrimination and sets forth specific limitations on that right.

[7] *See also In re Hague,* 105 *N.J.Eq.* 134, 141 (1929) in which the Chancery Court, wrote intrusion into and compulsory exposure of one's *private* affairs and papers ... is contrary to the principles of free government and is abhorrent to the instincts of Englishmen and Americans. *Id.* at 141 (emphasis added). The court added, "Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of *personal* security, and that involves, not merely protection of his person from assault, but exemption of his *private* affairs, books and papers from the inspection and scrutiny of others, without the enjoyment of this right, all others would lose half their value." *Id.* (emphasis added).

*L.Ed.* 746, 6 *S.Ct.* 524 [, at 532]. *The privilege reflects "our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life.' "* Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 12 L.Ed.2d 678, 84 S.Ct. 1594 [, 1597] (1964). "It respects a private inner sanctum of individual feeling and thought* and proscribes state intrusion to extract self-condemnation." [citations omitted.] "The Fifth Amendment in its Self-Incrimination clause *enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment." Griswold v. Connecticut,* 381 *U.S.* 479, 484, 14 *L.Ed.*2d 510, 85 *S.Ct.* 1678 [, 1681] (1965). *See also Katz v. United States,* 389 U.S. 347, 350 n. 5, 19 *L.Ed.*2d 576, 88 *S.Ct.* 507 [, 510–11 n. 51] (1967). (emphasis added.) [*Id.,* 425 *U.S.* at 416, 96 *S.Ct.* at 1583–84, 48 *L.Ed.*2d at 59 (Brennan, J., concurring).]

Similarly, in *In re Addonizio,* 53 *N.J.* 107 (1968), this Court recognized that an individual's *personal* financial records, such as personal checking account statements and lists of personal assets including securities, mutual funds and real and personal property were privileged.

*Addonizio* predated both the *Fisher* and *Doe* decisions. Since the *Fisher* and *Doe* decisions, the issue of whether under New Jersey law the privilege of self-incrimination extends to the non-required business records of a sole proprietor has not been before this court.[8] Thus, this case is one of first impression for us.

 We affirm our belief in the *Boyd* doctrine and hold that the New Jersey common law privilege against self-incrimination protects the individual's right "to a private enclave where he may lead a private life." *Murphy v. Waterfront Comm'n,* 378 *U.S.* 52, 55, 84 *S.Ct.* 1594, 1597, 12 *L.Ed.*2d 678, 681 (1964). To determine whether the evidence sought by the government lies within that sphere of personal privacy a court

---

[8]In *State v. Stroger,* 97 *N.J.* 391 (1984), *cert. denied,* 469 *U.S.* 1193, 105 *S.Ct.* 971, 83 *L.Ed.*2d 974, the respondent was under investigation by the Division of Ethics and Professional Services (DEPS). He complied with DEP's request to produce his bookkeeping records that Rule 1:21–6 required him to keep. DEPS turned these records over to the prosecutor's office, which used them against Stroger in prosecuting embezzlement charges. Stroger appealed the denial of his motion to suppress the documents. We affirmed the denial of that motion, relying on the required-records exception to the Fifth Amendment privilege.

must look to the "nature of the evidence." *Couch v. United States,* 409 *U.S.* 322, 350, 93 *S.Ct.* 611, 626, 34 *L.Ed.*2d 548, 566 (1973) (Marshall, J., dissenting). In the case of documents, therefore, a court must look to their contents, not to the testimonial complusion involved in the act of producing them, as the Supreme Court has done in *Fisher* and *Doe.* Neither *Fisher* nor *Doe* recognize the fundamental privacy principles underlying the New Jersey common-law privilege against self-incrimination. Thus, in defining the scope of our common-law privilege, we decline to follow the Court's rationale for its *Doe* decision.

## IV

■ Nevertheless, as a matter of New Jersey common law, we agree with the result in *Fisher* and *Doe.* The subpoenaed documents in issue are the business records of Guarino, doing business as Green Acres Estates, a real estate concern. The business records of a sole proprietor do not lie within that special zone of privacy that forms the core of the documents protected by *Boyd* and its progeny, and that are protected by the New Jersey privilege against self-incrimination.[9]

It has long been recognized that business records of entities may be subpoenaed and that even the personal business records of an individual which have been disclosed to or were within the knowledge of a third party generally are not privileged. *Fisher v. United States, supra,* 425 *U.S.* at 424–25, 96 *S.Ct.* at 1587–88, 48 *L.Ed.*2d at 64. Such records do not contain "the requisite element of privacy or confidentiality essential for the privilege to attach." *Bellis v. United States, supra,* 417 *U.S.*

---

[9]If Guarino had contended that any part of these records invoked concerns of personal privacy, e.g. personal comments, telephone numbers, or the like that would warrant protection, the result might be different. No such issue has been raised. Cf. *Klitzman, Klitzman & Gallagher v. Krut,* 744 *F.*2d 955 (3d Cir.1984) ("warrant authorizing virtually a wholesale search and seizure of business records" of a law firm in which one of its attorneys was the target of a criminal investigation was overbroad and constitutionally infirm).

at 92, 94 *S.Ct.* at 2185, 40 *L.Ed.*2d at 686. The business records of a corporation, partnership or a sole proprietor are not an extension of the more intimate aspects of one's life.

As Justice Marshall stated in *Couch v. United States:*

Diaries and personal letters that record only their author's personal thoughts lie at the heart of our sense of privacy. In contrast, I see no bar in the Fourth or Fifth Amendments to the seizure of a letter from one conspirator to another directing the recipient to take steps that further the conspiracy. Business records like those sought in this case lie between those cases. We are not so outraged by the intrusion on privacy that accompanies the seizure of these records as we are by the seizure of a diary, yet the records could not easily be called "instrumentalities" of tax evasion, particularly if they are accurate. [*Couch v. United States*, 409 *U.S.* at 350, 93 *S.Ct.* at 626, 34 *L.Ed.*2d at 566 (Marshall, J., dissenting).]

Recently, other courts have recognized the apparent anomaly of protecting the business records of a sole proprietor but not those of a corporation, partnership or other artificial entity.[10] *See Butcher v. Bailey*, 753 *F.*2d 465, 469 (6th Cir.1985); *United States v. Schlansky*, 709 *F.*2d 1079, 1083 (6th Cir.1983); *In re Grand Jury Proceedings (United States)*, 626 *F.*2d 1051, 1054 n. 2 (1st Cir.1980). These courts concluded that under the *Boyd* privacy rationale the contents of personal business records of sole proprietors do not have the same degree of privacy, as non-business personal papers, such as personal diaries or drafts of letters; and hence, they are not entitled to the same privacy considerations. Persuasive scholarship also supports this view and has concluded that

[t]he corporate or individual nature of the defendant and the legal relationships among the corporation, its agents, and the documents should be irrelevant to the question of privilege when the amendment is applied to business documents. Such documents should be unprivileged no matter who asserts the claim.

---

[10]*Andresen v. Maryland*, 427 *U.S.* 463, 96 S.Ct. 2737, 49 *L.Ed.*2d 627 (1976), supports this conclusion. In that case, the Court, in upholding the seizure of the personal business records of an attorney under a warrant, repeatedly emphasized that the documents were business records.

"Developments in the Law-Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions," 92 *Harv.L.Rev.* 1227, 1286 (1979).[11]

Under this reasoning, the withdrawal of the privilege to all business records is totally consistent with *Boyd*, which still retains its full vigor as to those "privacies of life" which are beyond the pale of legitimate government intrusion.

The subpoenaed documents here illustrate that the business records of a sole proprietor are simply not private. They do not contain the requisite element of privacy or confidentiality essential to be privileged. The purpose of business records is frequently to record transactions with second and third parties. In today's highly computerized, commercialized and regulated world, there is little expectation of privacy for such records that touch so little on the intimate aspects of one's personal life. This is particularly true of the records requested here: contracts of sale, cash receipts, journals and general ledgers. They document payments made by purchasers of property from Guarino doing business as Green Acres Estates. Many of these documents of sale are presumably reviewed by the purchasers, their attorneys and their accountants, then used in preparing the purchaser's tax returns and possibly filed at county recording offices. Normally, such documents are disclosed to a significant number of individuals, to an extent totally inconsistent with any claim of privacy.

Moreover, we do not perceive any reason why the records of a sole proprietor kept in the ordinary course of business are entitled to any greater protection than the business records of a

---

[11]"Developments in the Law-Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions", *supra*, 92 *Harv.L.Rev.* at 1283 further notes that "the dubious asymmetry" between the Fifth Amendment status of a corporate official and that of an individual businessman "was supported by unpersuasive property and agency principles. In *Bellis* the Court seemed to be seeking to eliminate the asymmetry by declaring all business enterprises collective entities and their members and employees mere agents. These problems could have been avoided if the Court had inquired whether the privilege applies to business documents at all, regardless of whether individual or entity created or possesses them, rather than asking whether a person asserting the privilege over commercial documents is entitled to do so."

partnership or corporation. Sole proprietors may operate large, substantial business enterprises, in many instances more extensive than small one-person corporations or two-person partnerships. Such records are indistinguishable from business records of other business entities and would enjoy protection only because of the form of the business organization chosen by their founders. In no way is the privilege related to the contents of the documents. To continue to distinguish between the business records of a sole proprietorship and other business entities not only would be inequitable but might in fact offer the knowledgeable white-collar criminal a means to avoid criminal prosecution.

Accordingly, under the New Jersey common law privilege against self-incrimination the business records of a sole proprietor do not have the requisite elements of personal privacy for the privilege to attach provided that the production of such records is itself both nontestimonial and non-incriminating in character.[12]

We reverse the judgment of the Appellate Division and reinstate the Trial Court's Order.

HANDLER, J., dissenting.

This case calls upon the Court to delineate the scope of protection to be accorded an individual required to produce personal business records under the mandate of a documentary subpoena. The issue arises in the context of a grand jury investigation into the business transactions of Green Acres

---

[12]Under *Fisher* and *Doe* the act of producing business records of a sole proprietor to the extent that it additionally possesses "testimonial aspects and incriminating effects" is entitled to protection under the Fifth Amendment privilege against self-incrimination. *United States v. Doe, supra,* 465 *U.S.* at 613–14, 104 *S.Ct.* at 1242–43, 79 *L.Ed.*2d at 560–61. In this case, Guarino was given immunity under *N.J.S.A.* 2A:81–17.3 for the act of producing the documents. Since we hold that the contents of the subpoenaed business records are not incriminatory evidence that Guarino was privileged to withhold, *N.J.S.A.* 2A:81–17.3 is not applicable with respect to the contents of the records.

Estates, a sole proprietorship owned by respondent Joseph Guarino. During the course of this grand jury investigation, a subpoena *duces tecum* was served upon Guarino directing that he individually produce various documents related to all real estate sales in Burlington and Cumberland Counties, from "January 1, 1970 to the present," made by him while doing business as Green Acres Estates. Guarino, upon appearing before the grand jury in June 1984, asserted the privilege against self-incrimination as justification for his refusal to produce the subpoenaed documents.

Responding to Guarino's exercise of his privilege against self-incrimination, the State petitioned the trial court for an order, pursuant to *N.J.S.A.* 2A:81–17.3, immunizing the production of the subpoenaed records. The trial court granted the State's application, entering an order which compelled the production of the documents, but immunized "the act of production of said records in any proceeding or prosecution for a crime or offense concerning matters arising out of the act of production of the records produced under order of the court...." *Ante* at 222. Thereafter Guarino, seemingly concerned about the prosecutorial use of any contents of his documents, filed a motion to quash the subpoena as violative of his privilege against self-incrimination under both federal and state law. This motion was denied on the authority of the Supreme Court's opinion in *United States v. Doe*, 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984). *See also Fisher v. United States*, 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (1976).

The majority accepts *United States v. Doe, supra,* as binding decisional authority governing the extent of protection available under the Fifth Amendment, but rejects application of the new federal standard to the settled and provident state common-law privilege. In the process, the Court underscores correctly the significance of *Boyd v. United States*, 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746 (1886), observing that *Boyd* and its progeny represent "a series of opinions [which] consistently ... repeated the axiom that an individual's private papers were

protected by the Fifth Amendment from compelled disclosure."
*Ante* at 223. While purporting to reaffirm the *Boyd*-inspired
concern for privacy underpinning this state's common-law privi-
lege, however, the majority instead re-defines the right, ignor-
ing the thrust of the pre-*Fisher* case law, thereby, in effect,
attenuating the privilege. The United States Supreme Court
abandoned *Boyd* and its progeny because it was unable both to
withdraw the privilege from the business records of sole propri-
etors and to retain the privacy rationale supporting the privi-
lege; the majority's attempt to do both, to circumscribe the
privilege while retaining its privacy rationale, succeeds only in
corrupting the rationale while diluting the privilege. The ma-
jority, in short, is partly right. This state's privilege against
self-incrimination should not be vitiated by adopting the dubi-
ous federal distinction between content and production; nor,
however, should the privilege be attenuated by redefining, as
the majority does, the scope of protected privacy.

I concur in the Court's conclusion with respect to the scope
and effect of the Fifth Amendment. In my opinion, however,
the New Jersey common-law privilege against self-incrimination
is strongly protective of privacy interests and serves to prohibit
both the compelled production as well as the disclosure of the
contents of personal business records of an individual. In
addition, New Jersey's statutory privilege, *N.J.S.A.* 2A:81–17.3,
which furnishes protections in the form of prosecutorial immu-
nity against the compelled disclosure of incriminating evidence,
is broadly intended to maximize the privacy interests inherent
in the privilege; it extends to all incriminatory contents of
documents derived as a result of state-compelled production.
For these reasons I dissent from the opinion of the Court.

## I.

I am constrained to agree with the majority that under
federal constitutional decisional law, the Fifth Amendment fur-
nishes no protection to Guarino against the enforcement of the

subpoena *duces tecum* in terms of compelling the disclosure of the contents of the records that the subpoena requires him to produce. Nevertheless, the historical analysis and evolution of federal Fifth Amendment doctrine remains important in shedding light upon the proper interpretation of the State's common-law privilege against self-incrimination, which has generally paralleled the development of the federal constitutional privilege.

Any historical review of these common-law and constitutional principles, as related to the subpoenaed production of documents, should appropriately commence with the seminal case of *Boyd v. United States, supra,* 116 *U.S.* 616, 6 *S.Ct.* 524, 29 *L.Ed.* 746. There the Court afforded broad protection to two partners who objected to a district court order directing that they produce a partnership business invoice. Upon reviewing the propriety of the district court's order, the Supreme Court found violations of both the Fourth and Fifth Amendments. The Court first held that "a compulsory production of a man's private papers to establish a criminal charge against him," *id.* at 622, 6 *S.Ct.* at 528, 29 *L.Ed.* at 748, violates the Fourth Amendment proscription against unreasonable searches and seizures. The Court also found a coexisting Fifth Amendment protection grounded in principles of privacy.

> It is not the breaking of his doors and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property, where that right has never been forfeited by his conviction of some public offense; it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime ... is within the condemnation of that judgment. In this regard the Fourth and Fifth Amendments run almost into each other. [*Id.* at 630, 6 *S.Ct.* at 532, 29 *L.Ed.* at 751.]

The Supreme Court held that "a compulsory production of the private books and papers of the owners of goods sought to be forfeited ... is compelling him to be a witness against himself,

within the meaning of the Fifth Amendment to the Constitution." *Id.* at 634–35, 6 *S.Ct.* at 534, 29 *L.Ed.* at 752.

The Supreme Court sedulously adhered to the fundamental privacy rationale of *Boyd* in a long line of subsequent decisions through the mid–1970s, therein confirming the significant role of individual privacy in Fifth Amendment jurisprudence. Commensurate with this primary focus on privacy concerns, it denied the applicability of the privilege to persons who merely hold subpoenaed documents in a representative capacity. *E.g. Wilson v. United States,* 221 *U.S.* 361, 31 *S.Ct.* 538, 55 *L.Ed.* 771 (1911) (when subpoena directed to corporation, privilege does not apply to corporate records which should be treated as public records and corporate officers as the custodians of those records); *Dreier v. United States,* 221 *U.S.* 394, 31 *S.Ct.* 550, 55 *L.Ed.* 784 (1911) (same as *Wilson* when subpoena directed to individual corporate officer); *United States v. White,* 322 *U.S.* 694, 64 *S.Ct.* 1248, 88 *L.Ed.* 1542 (1944) (same as *Wilson* when subpoena directed to individual as record custodian of unincorporated organizations).

The long-standing privacy principles of *Boyd* were further reinforced in *Couch v. United States,* 409 *U.S.* 322, 93 *S.Ct.* 611, 34 *L.Ed.*2d 548 (1973). The Court there stressed that encompassed within the Fifth Amendment is an unceasing commitment to the protection of privacy; it " 'respects a private inner sanctum of individual feeling and thought'—an inner sanctum which necessarily includes an individual's papers and effects to the extent that the privilege bars their compulsory production and authentication—and 'proscribes state intrusion to extract self-condemnation.' " *Id.* at 327, 93 *S.Ct.* 615, 34 *L.Ed.*2d at 552. Although reaffirming its adherence to the privacy concerns within the federal privilege, the Court was nevertheless constrained, on the facts, to conclude that the taxpayer had forfeited any legitimate expectation of privacy in her tax records because she had turned the papers over to her accountant. Accordingly, consistent with the exception from the privacy-based privilege for various organizational doc-

uments held in representative capacity, production of the tax-payer's no longer "private" records was deemed to be unprivileged.

In *Bellis v. United States, supra,* 417 *U.S.* 85, 94 *S.Ct.* 2179, 40 *L.Ed.*2d 678, the Supreme Court continued to draw sharp distinctions directed toward preservation of privacy interests under the Fifth Amendment, this time focusing on the distinction between a sole proprietor's business records and those of a three-man partnership. Underscoring the protection furnished by the privilege over personal, private and individual interests, the Court uncategorically extended the privilege "to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life," *id.* at 87–88, 94 *S.Ct.* at 2182–83, 40 *L.Ed.*2d at 683, on the basis of its perception that such a business entity does not have "an independent identity" apart from its individual owner. *Id.* at 92–93, 94 *S.Ct.* at 2185, 40 *L.Ed.*2d at 686–87. As acknowledged by the majority today, the confirmation in *Bellis* of *Boyd's* privacy values reflected the "prevailing rule," *ante* at 239, namely, that "the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers as well as compelled oral testimony." *Id.* at 87, 94 *S.Ct.* at 2182, 40 *L.Ed.*2d at 683; Comisky and Comisky, "Supreme Court in Doe Limits Fifth Amendment Protection But Uncertainty Remains," 61 *J.Tax'n,* 66 (1984). This, without the slightest hint that in some esoteric way the compelled production of private personal documents could, or should, be separated from the subsequent disclosure of their contents.

Thus, until 1976, the Supreme Court consistently and repeatedly recognized the privacy interest of the *Boyd* standard as a critical factor in determining whether individuals could withhold the production, as well as the contents, of incriminating personal documents. However, as the ink was just beginning to dry on its latest reaffirmation of the privacy interests encompassed by the Fifth Amendment, the Supreme Court, in

*Fisher v. United States, supra,* 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39, wholly abandoned this standard. Note, "The Right of Criminal Defendants and the Subpoena Duces Tecum: The Aftermath of *Fisher v. United States,*" 95 *Harv.L.Rev.* 683 (1982). Instead, it resorted to a test, extrapolated from cases involving nondocumentary evidence, that focused solely upon the testimonial character of evidence.[1] *See, e.g., Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966) (no Fifth Amendment protection to giving of blood samples because such act is neither testimonial nor relative to some communicative act or writing); *Gilbert v. California,* 388 *U.S.* 263, 87 *S.Ct.* 1951, 18 *L.Ed.*2d 1178 (1967) (applying *Schmerber* exception from Fifth Amendment protection to handwriting exemplars); *United States v. Wade,* 388 *U.S.* 218, 87 *S.Ct.* 1926, 18 *L.Ed.*2d 1149 (1967) (applying *Schmerber* exception from Fifth Amendment protection to voice exemplars). The *Fisher* Court held that a government subpoena violates the Fifth Amendment only when "the accused is compelled to make a testimonial communication that is incriminating." *Fisher, supra,* 425 *U.S.* at 408, 96 *S.Ct.* at 1579, 48 *L.Ed.*2d at 54.

This new standard devised by the Supreme Court in *Fisher* impelled it to distinguish between the act of producing documents and the act of revealing the contents of such doc-

---

[1]The Supreme Court rationalized its conclusion as follows:

The Framers addressed the subject of personal privacy directly in the Fourth Amendment. They struck a balance so that when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue. They did not seek in still another Amendment—the Fifth—to achieve a general protection of privacy but to deal with the more specific issue of compelled self-incrimination.

We cannot cut the Fifth Amendment completely loose from the moorings of its language, and make it serve as a general protector of privacy—a word not mentioned in its text and a concept directly addressed in the Fourth Amendment. We adhere to the view that the Fifth Amendment protects against "compelled self-incrimination, not [the disclosure of] private information." [*Fisher v. United States, supra,* 425 *U.S.* at 400–01, 96 *S.Ct.* at 1576, 48 *L.Ed.*2d at 50 (citation omitted).]

uments. The Court recognized that under certain circumstances the act of production might be protected—if the act of production itself was compelled and was "testimonial" in character. *Id.* at 411, 96 *S.Ct.* at 1581, 48 *L.Ed.*2d at 56. Conversely, the Court reasoned that because the government had not compelled the creation of the subpoenaed document, the existence of the document's contents should be deemed voluntary rather than compelled; hence, no Fifth Amendment protection should be accorded to the disclosure of the document's contents. *Id.* 409–410, 96 *S.Ct.* at 1580–81, 48 *L.Ed.*2d at 55.

Most recently, in *United States v. Doe, supra,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552, on facts virtually identical to this case, the Court confirmed the *Fisher* ruling, holding that the contents of voluntarily prepared business records of a sole proprietor fell outside the protections of the Fifth Amendment. With one eye toward *Fisher,* and noting that "[r]espondent does not contend that he prepared the documents involuntarily or that the subpoena would force him to restate, repeat, or affirm the truth of their contents," *id.* at 611–12, 104 *S.Ct.* at 1242, 79 *L.Ed.*2d at 559–60, the Court ruled "that the contents of [the Doe] records are not privileged." *Id.* at 612, 104 *S.Ct.* at 1242, 79 *L.Ed.*2d at 560. The *Doe* Court further remarked that "[a]lthough the contents of a document may not be privileged, the act of producing the document may be." *Id.* It acknowledged, however, that while the act of production pursuant to a subpoena constitutes compelled production, the Fifth Amendment only protects the act of production to the extent that it additionally possesses "testimonial aspects and incriminating effect[s]." *Id.*[2]

---

[2]Because in *Doe* the District Court found that producing the documents would "compel [respondent] to admit that the records exist, that they are in his possession, and that they are authentic," the Supreme Court ruled that the act of production involved testimonial self-incrimination. *United States v. Doe, supra,* 465 *U.S.* at 613–14, 104 *S.Ct.* at 1242–43, 79 *L.Ed.*2d at 560–61. This result was unlike that reached in *Fisher,* where the Court held that the act of production would not be testimonial because "the existence and location of the

It is evident that under current Fifth Amendment doctrine, no constitutional protection is extended to a sole proprietor to prevent the compelled production of his personal business records provided the production of such records is itself both non-testimonial and non-incriminatory in character. Further, the Fifth Amendment affords no protection against the compelled disclosure of the contents of such records if the records themselves were voluntarily created. The majority is therefore accurate in its assessment of the federal constitutional privilege in this case. The Fifth Amendment assuredly would not prevent enforcement of the subpoena to compel the production of Guarino's records or the disclosure of their contents, as long as immunity is furnished against the prosecutorial use of any of the testimonial effects attending such production.

## II.

We may fairly ask, however, whether current Fifth Amendment doctrine, as exemplified in *Fisher* and *Doe*, sheds light upon or gives determinative meaning to the State common-law privilege against self-incrimination. I am firmly of the opinion that the essential understanding of our state law mirrors that of the federal decisional law prior to the mutational change wrought by *Fisher* and *Doe*. I have no hesitancy in concluding on grounds of clear public policy, strong state traditions, and consistent decisional precedent, that our common-law privilege against self-incrimination fully embraces the notion of protecting the personal privacy of the individual. Accordingly, our privilege does not accommodate the highly restricted view of affording protection solely to the compelled production of personal records; nor does it tolerate a distinction between the compelled production of voluntarily created personal records on

---

papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the government's information by conceding that he in fact has the papers." *Fisher v. United States, supra*, 425 *U.S.* at 411, 96 *S.Ct.* at 1581, 48 *L.Ed.*2d at 56.

the one hand and, on the other, the resultant disclosure of the contents of such records once they have been produced.

## A.

*Fisher* and *Doe* have earned substantial criticism and· generated considerable uncertainty with respect to their justification, meaning and application. This counsels strongly against the passive adoption of these decisions as reflective of the meaning and scope of the state common-law privilege against self-incrimination.[3]

The bifurcation of the privilege against self-incrimination between acts of production and revelation of contents has proved artificial and perplexing. Heidt, "The Fifth Amendment Privilege and Documents—Cutting *Fisher*'s Tangled Line," 49 *Mo.L.Rev.* 439, 473 (1984) (under *Fisher*, "innocuous documents may now be suppressed and highly incriminating documents compelled.... That the government only wants the documents and is not interested in using the implied admissions is [treated as] immaterial"). One court has gone so far as to indicate that it "is unable to understand why the most important element, the contents of the documents, has no Fifth Amendment privilege, but the Supreme Court has spoken clearly on this issue; and that court, not this court, makes the law." *United States v. McPhaul,* 617 *F.Supp.* 58, 60 (W.D.N.C.1985). An effect of this forced distinction is to concentrate the ensuing analysis upon the act of production, which is usually the pivotal event involving government compulsion. Having confined the privilege to the compulsion that attends production, courts are constrained to determine whether the act of production is

---

[3]One judge described his role in discerning the present state of the law surrounding the Fifth Amendment privilege as that of a "tea leaves" reader, *United States v. Karp,* 484 *F.Supp.* 157, 158 (S.D.N.Y.1980), while another judge has characterized his task as searching for "[t]he clues to [a] mystery...." *In re Grand Jury Subpoenas Served February 27, 1984,* 599 *F.Supp.* 1006, 1009 (E.D.Wash.1984).

"testimonial" in character since the privilege applies only to testimonial compulsion. Hence, the inquiry that this standard impels becomes somewhat unreal, dissecting the act of production for evidence of such elusive and esoteric constructs as the "tacit concession of existence" or "implicit authentication" of documents. *E.g., In re Grand Jury Subpoena Duces Tecum Dated November 13, 1984,* 616 *F.Supp.* 1159, 1161 (E.D.N.Y. 1985).

The infirmity of the *Fisher-Doe* dichotomy is vividly demonstrated by the confusion, and perhaps the discomfort, of lower federal courts called upon to apply this newly formulated criterion to purely personal papers. In *United States v. (Under Seal),* 745 *F.*2d 834 (4th Cir.1984), *cert. granted,* 469 *U.S.* 1188, 105 *S.Ct.* 954, 83 *L.Ed.*2d 962 (1985), the court quashed, on Fifth Amendment grounds, a subpoena issued to a target of a grand jury investigation compelling production of certain specified records held by him in his individual capacity. Although asserting the Supreme Court's mandate that the contents of a sole proprietor's records are not clothed with Fifth Amendment protection, *id.* at 835–36 n. 2 *citing United States v. Doe, supra,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552, the Fourth Circuit returned to *Boyd*'s privacy focus for purposes of evaluating protection of an individual's personal papers, stating that

> [t]he fundamental teaching of *Boyd* is consistent with this purpose: the forced disclosure of private incriminating information jeopardizes the individual's right to keep at least that aspect of himself which is reflected in his private papers free from the intrusive hands of the government. Implicit in the cherished right of the individual to "pursue happiness" is the concomitant right to express one's own thoughts free from the government's exaction of those thoughts upon penalty of one's liberty. We therefore hold, in line with *Boyd* that the fifth amendment prevents the government from subpoenaing an individual's incriminating papers that are in his possession and are held by him in an individual, as opposed to representative capacity. [*Id.* at 840 (citations omitted).]

In *In re Grand Jury Subpoenas Served Feb. 27, 1984,* 599 *F.Supp.* 1006, 1009 (E.D.Wash.1984), the court reached a similar result despite feeling constrained to acknowledge that the

contents of non-business personal papers would be rendered unprivileged under a "mechanical application of the *Fisher* test." *Id.* at 1010. Notwithstanding this recognition of the *Fisher-Doe* restrictions, the court declined to be bullied into a posture of not affording protection to an individual's private papers. *But see Butcher v. Bailey*, 753 *F.*2d 465 (6th Cir.1985) (Fifth Amendment protection not accorded to contents of individual's personal records because information contained in records not so intimately personal as to evoke serious privacy concerns); Note, "Abolition of Fifth Amendment Protection for the Contents of Preexisting Documents: *United States v. Doe*," 38 *S.W.L.J.* 1023, 1036–37 (1984) ("the Court [has not] offered a rationale for how private papers could be protected that is consistent with the emphasis on compulsion [under its Fisher/Doe analysis]").

Because of the unsoundness of this new conceptualization of the Fifth Amendment, I am persuaded by Justice Brennan's reasoning that would keep the focus not solely upon the testimonial incidents that can be read into the act of producing personal records. Rather, the target should be the contents of documents, which are the heart of the Fifth Amendment's solicitude for privacy and the true object of the government's compulsory efforts. The Fifth Amendment's protection should attach to an individual's books and papers because their contents can be equated with an individual's mental notations.

The common-law and constitutional extension of the privilege to testimonial materials, such as books and papers, was inevitable. An individual's books and papers are generally little more than an extension of his person. They reveal no less than he could reveal upon being questioned directly. Many of the matters within an individual's knowledge may as easily be retained within his head as set down on a scrap of paper. I perceive no principle which does not permit compelling one to disclose the contents of one's mind but does permit compelling the disclosure of the contents of that scrap of paper by compelling its production. Under a contrary view, the constitutional protection would turn on fortuity, and persons would, at their peril, record their thoughts and the events of their lives. The ability to think private thoughts, facilitated as it is by pen and paper, and the ability to preserve intimate memories would be curtailed through fear that those thoughts or the events of those memories would become the subject of criminal sanctions however invalidly imposed. Indeed, it

was the very reality of those fears that helped provide the historical impetus for the privilege. See *Boyd v. United States, supra,* [116 *U.S.*] at 631–632, 29 *L.Ed.* 746, 6 *S.Ct.* 524 [, at 532–33]; E. Griswold, The Fifth Amendment Today 8–9 (1955); 8 J. Wigmore, Evidence § 2250, pp. 277–281 (McNaughton rev. 1961); *id.,* § 2251, pp. 313–314; McKay, Self-Incrimination and the New Privacy, 1967 Supreme Court Review 193, 212. [*Fisher, supra,* 425 *U.S.* at 420, 96 *S.Ct.* at 1585–86, 48 *L.Ed.*2d at 61–62 (Brennan, J., concurring).]

Assuming, moreover, that as a matter of logical analysis the contents of documents can be separated from their production, this analytical parsing should not serve to truncate or attenuate the substance of the privilege itself. There is nothing in the Fifth Amendment that insists that the contents of documents be created through compulsion in order to secure their protection—no more so than the thought which precedes the expression must itself be forced in order for the privilege to apply to a person's mental processes and verbalizations. As Justice Brennan observed, "it does not follow that the protection is necessarily unavailable if the papers were prepared voluntarily, for it is the compelled production of testimonial evidence, not just compelled creation of such evidence, against which the privilege protects." *Id.,* 425 *U.S.* at 423, 96 *S.Ct.* at 1587, 48 *L.Ed.*2d at 63.[4]

---

[4]Justice Marshall also recognized the infirmity of the Court's attempted distinction between the creation of documents and the production of documents. He predicted in *Fisher* that act-of-production immunity arising from self-incriminating existence testimony would derivatively protect the documents' contents.

> Under the Court's theory, if the document is to be obtained the immunity grant must extend to the testimony that the document is presently in existence. Such a grant will effectively shield the contents of the document, for the contents are a direct fruit of the immunized testimony—that the document exists—and cannot usually be obtained without reliance on that testimony. Accordingly, the Court's theory offers substantially the same protection against procurement of documents under grant of immunity that our prior cases afford. [*Fisher v. United States, supra,* 425 *U.S.* at 433–34, 96 *S.Ct.* at 1592, 48 *L.Ed.*2d at 69–70 (Marshall, J. concurring).]

It is obvious that this understanding is not shared by the Supreme Court. *See, e.g., United States v. Doe, supra,* 465 *U.S.* at 617, n. 17, 104 *S.Ct.* at 1244–45, n. 17, 79 *L.Ed.*2d at 563, n. 17.

I am satisfied that the *Fisher-Doe* doctrine does not reflect a sound policy that can be commended as an interpretive source of the State's common-law privilege against self-incrimination. It is a doctrine that is problematic in its historical origins, contrary to constitutional tradition, a departure from long-standing constitutional philosophy, and productive of artificial and arbitrary applications. Our own common-law privilege against self-incrimination springs from a source that antedates *Fisher-Doe* and is nourished by constitutional principles alien to those that now dominate the Fifth Amendment.

### B.

The privilege against self-incrimination, "although not written into our State Constitution, is firmly established as part of our common law." *State v. Vinegra*, 73 *N.J.* 484, 488 (1977) (citations omitted). *See State v. Hartley*, 103 *N.J.* 252 (1986). The privilege is also incorporated in our Rules of Evidence. *See Evid.R.* 23, 24 and 25. It is a common-law doctrine that carries all of the vigor of constitutional law. "New Jersey courts from the earliest times have been zealous to protect [this] important common law right—that of free men to be shielded from compulsory self-incrimination." *State v. Vinegra, supra*, 73 *N.J.* at 494 (Weintraub, C.J., dissenting); *see State v. Zdanowicz*, 69 *N.J.L.* 619, 622 (E. & A. 1903) ("Although we have not deemed it necessary to insert in our constitution [the privilege against self-incrimination], the common law doctrine ... is by us deemed to have full force. In New Jersey, no person can be compelled to be a witness against himself"); *Fries v. Bugler*, 12 *N.J.L.* 79, 81 (Sup.Ct.1830) ("a witness cannot be called upon to impute to himself a crime or to bring reproach upon himself"); *ante* at 230 n. 7. The protection it is designed to achieve is a "basic policy against self-condemnation." *State v. DeCola*, 33 *N.J.* 335, 341 (1960).

It stands unquestioned that our State common-law privileges may provide more exhaustive protection than that afforded

under similar or identical federal constitutional doctrine. *See, e.g., Dairy Stores Inc. v. Sentinel Publishing Co., Inc.,* 104 *N.J.* 125 (1986). The common-law privilege against self-incrimination itself is more protective than its federal counterpart. *See State v. Vinegra, supra,* 73 *N.J.* at 490 ("The common law privilege against self-incrimination in New Jersey as expounded in our target doctrine seems to afford greater protection than that given by the Fifth Amendment"); *State v. Deatore,* 70 *N.J.* 100, 112 (1976) ("We reach that conclusion as a matter of state law and policy, as to which we may impose standards more strict than that [sic] required by the federal Constitution"). Hence, I conclude that the common-law privilege against self-incrimination protects the contents of a sole proprietor's business records consistent with our unyielding commitment to individual privacy concerns.

As acknowledged by the majority, *ante* at 230–231, the underlying rationale for our common-law privilege against self-incrimination was identified by Justice Brennan, while still a member of this Court, in *In re Pillo,* 11 *N.J.* 8, 15–16 (1952):

> In modern concept its wide acceptance and broad interpretation rest on the view that compelling a person to convict himself of a crime is "contrary to the principles of free government" and "abhorrent to the instincts of an American," that while such a coercive practice "may suit the purposes of despotic power ... it cannot abide the pure atmosphere of political liberty and personal freedom." *Boyd v. United States,* 116 *U.S.* 616, 632, 6 *S.Ct.* 524 [533], 29 *L.Ed.* 746, 751 (1886).

This incorporation of *Boyd,* a case noteworthy for its endorsement of privacy values as the foundation of the Fifth Amendment privilege against self-incrimination, see discussion, *supra* at 222–223, provides firm grounds for rejecting, as a matter of common-law, any analysis which diminishes the import of privacy values. The majority also aptly quotes Justice Brennan's reiteration in *Fisher* of the privacy interests protected by our common-law privilege. *Ante* at 230–231. In light of the majority's holding in this case, Justice Brennan's reaffirmation is all the more poignant for its insistence that the rights of

privacy be realized, not merely acknowledged while being diminished:

> The Court pays lip service to this bedrock premise of privacy ... [b]ut this only makes explicit ... the view that protection of personal privacy is merely a byproduct and not, as our precedents and history teach, a factor controlling in part ... the scope of the privilege. This ... approach is fundamentally at odds with the settled principle that the scope of the privilege ... has the reach necessary to protect the cherished value of privacy which it safeguards. [*Id.,* 425 *U.S.* at 416, 96 *S.Ct.* at 1584, 48 *L.Ed.*2d at 59 (Brennan, J., concurring).]

In the context of a subpoena *duces tecum* that has as its purpose "obtain[ing] the production of documents ... that will aid in the development of testimony at trial," *State v. Kaszubinski,* 177 *N.J.Super.* 136, 141 (Law Div.1980), the need to vigilantly safeguard the privilege becomes particularly acute because the State's primary objective is to enhance its case through compelling an individual to dispossess his own papers, hoping to subsequently uncover incriminating information. *Accord State v. Hunt,* 91 *N.J.* 338 (1982).[5] Recognizing the grave intrusion that sanctioning such a process would have on one's individual liberties, this Court, in *In re Addonizio,* 53 *N.J.* 107 (1968) sent out an unequivocal message that it would not tolerate such an offensive use of an individual's personal documents. *Addonizio* involved a subpoena directing that appellant produce certain records kept in his individual capacity before a grand jury. The producer was in fact the target of a grand jury investigation. The Court, relying on a logical per-

---

[5]In *State v. Hunt,* 91 *N.J.* 338 (1982), we were posed with the question of whether an individual has a protectible interest in toll billing records held by the telephone company. Although recognizing that any claim of Fourth Amendment protection was foreclosed by the Supreme Court in *Katz v. United States,* 389 *U.S.* 347, 88 *S.Ct.* 507, 19 *L.Ed.*2d 576 (1967), we turned to the New Jersey Constitution to afford the defendant protection. Relying on our view that "the equities ... strongly favor protection of a person's privacy interest," *State v. Hunt, supra,* 91 *N.J.* at 345, we determined that an individual "is entitled to assume that the numbers he dials in the privacy of his own home will be recorded solely for the telephone company's business purposes." *Id.* at 347. Accordingly, upon holding the toll billings record to be part of the "privacy package," we determined that such records were improperly seized without warrants based on probable cause.

ception of the intended use of the subpoenaed documents, quashed the subpoena on the grounds that "it is inconceivable that the records of Addonizio could reveal criminality upon the others without also implicating him." *Id.* at 117. Purely to protect an individual from the damaging consequences of his personal papers, this Court precluded use of the contents of the documents.

The result in *Addonizio,* although admittedly pre-dating *Fisher* and *Doe,* was wholly inspired by the principles expressed much earlier in *Boyd* and adopted and reiterated in *In re Pillo, supra,* 11 *N.J.* at 15–16, as a matter of state common-law. The importance of safeguarding individual privacy has continued unabated within our state. *See State v. Hartley, supra,* 103 *N.J.* 252.

I concur, in short, in Justice Brennan's rejection of the notion that privacy "is merely a byproduct and not, as our precedents and history teach, a factor controlling in part the determination of the scope of the [Fifth Amendment] privilege." *Fisher v. United States, supra,* 425 *U.S.* at 416, 96 *S.Ct.* at 1584, 48 *L.Ed.*2d at 59. In so concurring, I follow the view embraced by this Court in *In re Pillo, supra,* 11 *N.J.* at 15–16, wherein Justice Brennan for this Court explicated New Jersey's common-law privilege against self-incrimination. This reasoning, augmented by the view expressed in *Bellis v. United States, supra,* 417 *U.S.* 85, 94 *S.Ct.* 2179, 40 *L.Ed.*2d 678, that the "zone of privacy" would extend to the business records of a sole proprietor, justifies the conclusion in this case that the contents of Guarino's subpoenaed documents command protection.

I am satisfied that the New Jersey common-law privilege against self-incrimination is fully protective of an individual's personal privacy interests, and would extend to the attempted prosecutorial use of any incriminating evidence that is of a testimonial nature. It would accord protection against the compelled production and resultant disclosure of the contents of

an individual's personal business records. This common-law privilege is firmly grounded on sound principles of public policy that are solicitous of the personal privacy protected in the criminal law context. Further, these principles, which reflect a strong state tradition that respects individual privacy, have been consistently confirmed by decisional precedent. For these reasons I would hold that a subpoena may not be enforced to compel an individual to produce private and personal records relating to the conduct of his sole business.

The United States Supreme Court was unable, in *Fisher* and *Doe*, to remove the *Boyd-Bellis* privilege from the tax, telephone, and business records of sole proprietors without also abandoning the privacy rationale that supported the privilege. Subsidiary authorities, cited by the majority as recognizing "the apparent anomaly of protecting the business records of a sole proprietor but not those of a corporation, partnership or other artificial entity," *ante* at 233, have seen such protection as anomalous precisely because they have also recognized that *Fisher* and *Doe* render the privacy of the documents' contents irrelevant:

> Since *Boyd,* the protection afforded contents has been largely eroded.... Although we do not read [*Fisher* and *Doe*] as holding that the contents of private papers are *never* privileged, it is evident ... that if contents are protected at all, it is only in rare situations, where compelled disclosure would break "the heart of our sense of privacy." [*Butcher v. Bailey,* 753 *F.*2d 465; 468–69 (6th Cir.1985), *quoting United States v. Doe,* 465 *U.S.* 605, 104 *S.Ct.* 1237, 1246 n. 2 [79 *L.Ed.*2d 552] (1984) (Marshall, J., concurring).]

*See also In re Grand Jury Proceedings (United States),* 626 *F.* 2d 1051, 1054 (1st Cir.1980) ("Since *Boyd,* the rule has been hedged about with exceptions and its rationales have been rejected"; post-*Fisher* but pre-*Doe* ). *United States v. Schlansky,* 709 *F.*2d 1079, 1083 (6th Cir.1983), observed that *Boyd* "retains its full vigor as to those 'privacies of life' which are beyond the pale of legitimate government intrusion," *quoting* Note, "Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments," 90 *Harv.L.Rev.* 945, 947 (1977). This observation was made prior

to *Doe,* however, while the Supreme Court was still on record in *Bellis* as believing that the business records of sole proprietors were among "the privacies of life" (though *Fisher*'s rejection of a privacy-based Fifth Amendment privilege cast doubt upon the vitality of *Bellis*). Withdrawal of the Fifth Amendment privilege from the business records of sole proprietors resulted not from a change of mind on the narrow issue of whether such records are private, as citation of those cases implies, but from a change of heart on the general proposition that the privacy they implicate matters. The cases cited by the majority view protection of a sole proprietor's business records as anomalous, *ante* at 233–234; they do so because they reject a perception of privacy that posits a distinction between sole proprietorships and other forms of business organization. They acknowledge that the anomaly is a function of the erosion of *Boyd,* not, as the majority insists, a faithful application of its underlying principles.

The majority, by contrast, purports to do what the Supreme Court and other authorities have recognized to be impossible: to withdraw the privilege while retaining the privacy rationale supporting it. If, as the majority insists, the pre-*Fisher, Boyd*-inspired federal decisions—and not *Fisher* and *Doe*—are to inform this State's common-law privilege, the majority's decision today simply cannot be squared with the final pre-*Fisher* case, *Bellis,* in which the Court extended the privilege explicitly "to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life." I believe that the United States Supreme Court reasoned correctly while ruling incorrectly; the boundary between personal and public is so nebulous in the case of a sole proprietor that the privilege cannot be denied without abandoning the rationale supporting it. The majority, in short, cannot have it both ways. Its attempt to do so conflates a *Fisher*-informed result with incongruous privacy reasoning. For this reason, I agree that priva-

cy controls the state common-law privilege, but dissent from the majority's application of the privacy standard.

### C.

I add to the foregoing analysis the observation that the records in this case would also be protected from disclosure under the state immunity statute, *N.J.S.A.* 2A:81–17.3. While this statute contains the same language as the federal immunity statute, 18 *U.S.C.* § 6002, I would construe it more broadly in order to accommodate the common-law privilege against self-incrimination which the statute serves to effectuate.

That interpretation is not in the slightest contrary to the intent or language of the Legislature. The statute provides in relevant part:

> In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order. After complying and if but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, such testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, may not be used against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order. [*N.J.S.A.* 2A:81–17.3.]

I would construe the phrase "directly or indirectly derived from such [privileged] * * * evidence" as completely protecting an individual from the incriminating use of the contents of documents produced under the compulsion of a subpoena. As noted by the Supreme Court in *Doe*, 465 *U.S.* at 617, n. 17, 104 *S.Ct.* at 1244–45, n. 17, 79 *L.Ed.*2d at 563, n. 17: "[t]o satisfy the requirements of the Fifth Amendment, a grant of immunity need be only as broad as the privilege against self-incrimination," *citing Murphy v. Waterfront Comm'n*, 378 *U.S.* 52, 107, 84 *S.Ct.* 1594, 1618, 12 *L.Ed.*2d 678, 712, (1964) (White, J., concurring); *see Pillsbury Co. v. Conboy*, 459 *U.S.* 248, 253, n. 8, 103 *S.Ct.* 608, 612, n. 8, 74 *L.Ed.*2d 430 (1983); *United States*

*v. Calandra,* 414 *U.S.* 338, 346, 94 *S.Ct.* 613, 619, 38 *L.Ed.*2d 561, 570, (1974).

The scope of protection attached to the statutory language of *N.J.S.A.* 2A:81–17.3 must coincide with the common-law privilege itself. It calls for an interpretation that independently protects all contents or, at a minimum, accords derivative protection of a document's contents in the absence of the State's demonstrating that it obtained the compelled, testimonial incriminating aspects arising from the privileged act of production independently.[6] *Cf. State v. McKenna,* 94 *N.J.Super.* 71, 75–76 (Cty.Ct.1967) ("the 'communicative' or 'testimonial' evidence protected by the Fifth Amendment is that by which the State obtains knowledge solely within the defendant's possession concerning the crime with which he is accused, and ... such knowledge was obtained by ... coercion").

The strength of this analysis rests upon an acceptance of the traditional *Boyd* standard, which has thus far prevailed in this state, and, as the majority affirms, remains unimpaired by *Fisher* and *Doe.*

### III.

With the majority of this Court, I accept reluctantly the rulings of the Supreme Court, now embodied in *Fisher* and *Doe,* as to the scope of protection applicable to subpoenaed individual personal business records under the Fifth Amendment. That protection would not in this case bar the compelled production of Guarino's subpoenaed records or the subsequent disclosure of their contents under a statutory grant of immunity limited to the act of production. Consequently, Guarino may well under the Fifth Amendment be exposed to incrimination.

I cannot, however, agree with this Court that our common-law privilege against self-incrimination would countenance this

---

[6]This result may arguably be analogized to the "use and fruits" immunity power of the SCI discussed in *In re Ippolito,* 75 *N.J.* 435 (1978).

result. For the reasons expressed, I would order the subpoena quashed or require the State to accord immunity against any incriminating evidence derived from the disclosure of the contents, as well as the production, of Guarino's records, commensurate with the dimensions of our common-law privilege against self-discrimination. Accordingly, I dissent.

Justices CLIFFORD and POLLOCK join in this opinion.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices O'HERN, GARIBALDI and STEIN—4.

*For affirmance*—Justices CLIFFORD, HANDLER and POLLOCK—3.