NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3764-20

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

MATTHEW DIAZ,

    Defendant-Respondent.

_____

APPROVED FOR PUBLICATION

February 7, 2022

APPELLATE DIVISION

Argued January 20, 2022 – Decided February 7, 2022

Before Judges Hoffman, Whipple and Susswein.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 19-07-1124.

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel; William Kyle Meighan, on the briefs).

Rochelle Watson, Deputy Public Defender II, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

This appeal arises from an investigation and ongoing prosecution for strict liability for drug-induced death, N.J.S.A. 2C:35-9, following a fatal heroin overdose. By leave granted, the State appeals from the July 20, 2021 Law Division order granting defendant's motion for reconsideration of the October 29, 2020 order that had denied defendant's motion to suppress statements he made to detectives during two custodial interrogations, one that occurred when he was first arrested as he was leaving his residence and another interrogation that occurred shortly thereafter at the police station.[1] The trial court reversed its initial decision and suppressed incriminating statements defendant made during the stationhouse interrogation because the interrogating officers did not advise him that he was facing prosecution for first-degree strict liability for drug-induced death. The State brings this appeal before trial and following the motion for reconsideration, which reversed the motion denied at the suppression hearing.

The State contends the detectives were not required at the outset of the custodial interrogation to inform defendant about the overdose death, that the

---

[1] We note that defendant has not cross-appealed from the trial court's decision to admit statements he made during the first of the two sequential custodial interrogations.

detectives at the time of the interrogation did not have probable cause to arrest defendant for the first-degree strict-liability homicide offense, and that the trial court erred in finding on reconsideration that defendant did not knowingly waive his Miranda[2] rights. After carefully reviewing the record in light of the applicable principles of law, we affirm the trial court's order suppressing defendant's incriminating statements made during the stationhouse interrogation. We do so for somewhat different reasons than those the trial court relied upon in its July 20, 2021 written decision and August 26, 2021 amplification letter submitted pursuant to Rule 2:5-1(b).

The record before us shows that the detectives deliberately and designedly misled defendant as to his true legal status by providing a vague and incomplete answer to defendant's inquiry as to the reason for his arrest. That was done pursuant to a planned investigative strategy to elicit incriminating statements linking defendant to the overdose death before defendant became aware that someone had died. By withholding this information when initially explaining why he had been taken into custody, the detectives in practical effect understated defendant's sentencing exposure. We also conclude that, viewed from an objective perspective, the detectives in this case were aware of facts constituting

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

probable cause to believe defendant committed the strict liability for drug-induced death offense notwithstanding they did not yet have the results of the autopsy or toxicology tests. We affirm based on our conclusion that, considering the totality of the circumstances, the State failed to establish beyond a reasonable doubt that defendant knowingly waived his right against self-incrimination.

I.

We begin by summarizing the pertinent facts that were adduced at the suppression hearing. In doing so, we recognize that defendant has not yet been tried and is presumed innocent. On May 8, 2019, the Toms River Police Department responded to a "possible drug overdose" at an apartment. Upon arrival, Detective Duncan MaCrae from the Toms River Police Department found Sheila Baita deceased. Tabatha Ludeman, Baita's roommate, was present in the apartment when Detective MaCrae arrived. Ludeman told the detective that she had purchased heroin from defendant the night before.

Ludeman explained that she communicated with defendant via Facebook Messenger and used that platform to arrange the drug deal. Ludeman stated that on the night of May 7, 2019, defendant went to Ludeman's apartment, accompanied by an unidentified Hispanic male. Defendant and the unidentified

male sold $80.00 worth of heroin to Ludeman. The heroin was divided into eight "wax folds."[3] Ludeman gave four of her wax folds to Baita.

Ludeman stated that she intravenously injected herself with two wax folds. She lost consciousness for approximately three hours. When she awoke, she found Baita's body on the floor. Ludeman reported that she "believe[d] . . . [Baita used] her heroin nasally, but was unsure how many folds" Baita ingested. Ludeman turned over to police two wax folds that were stamped "American Made" in red ink and reported that she found the wax folds among Baita's belongings.

Ludeman agreed to cooperate with the police investigation of Baita's death. She authorized police to download her Facebook Messenger conversation with defendant. She also provided a recorded statement and identified a photograph of defendant. Ludeman informed police that she believed that defendant resided on Lien Street in Toms River. Police placed that residence under surveillance.

---

[3] We use the terms "fold(s)" and "bag(s)" interchangeably throughout this opinion.

A-3764-20

Ludeman also agreed to a "consensual intercept between [her] and defendant."[4] Detective MaCrae and Ocean County Prosecutor's Office Detective Brant Uricks instructed Ludeman to call defendant and ask for "the same stuff as last night." Ludeman complied and advised defendant that another individual was at her apartment with money to purchase heroin, but that person "would not be there long." Defendant responded that he would be at her apartment in approximately six minutes.

---

[4]  A consensual interception, during which police listen in on a telephone conversation involving a cooperating witness or informant, is authorized under the New Jersey Wiretapping and Electronic Surveillance Control Act (Wiretap Act), N.J.S.A. 2A:156A-1 to -37. N.J.S.A. 2A:156A-4(c) provides that:

> It shall not be unlawful under this act for:
>
> . . . .
>
> Any person acting at the direction of an investigative or law enforcement officer to intercept a wire, electronic or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception; provided, however, that no such interception shall be made without the prior approval of the Attorney General or his designee or a county prosecutor or his designee.

The use of this investigative technique shows that the investigation of the overdose death was done in conjunction with if not under the direct supervision of the county prosecutor's office.

A-3764-20

After the phone conversation ended, Toms River Police Department Detective Travis Seaman, who was stationed outside defendant's apartment, "observed defendant come out the common doorway at his residence." Detective Seaman "approached the defendant, identified himself and advised defendant of his <u>Miranda</u> rights from memory."[5] Detective Seaman testified at the suppression hearing that after he and the police officers identified themselves, defendant was not free to leave because "he was being held under investigative detention . . . ."[6] When asked why he had administered <u>Miranda</u> warnings immediately, Detective Seaman explained that it was because defendant "was going to be questioned."

Defendant indicated to Detective Seaman that he understood his rights and asked the detective "what [this] was about." Detective Seaman responded to

---

[5] So far as the record shows, the <u>Miranda</u> colloquy outside defendant's residence was not recorded. Defendant does not contend the detective misspoke when administering the <u>Miranda</u> warnings from memory.

[6] We note that the State on appeal does not contend that defendant was not in custody for <u>Miranda</u> purposes when Detective Seaman administered the <u>Miranda</u> warnings. The State asserted before the trial court that this exchange did not constitute a custodial interrogation. However, this contention was not raised on appeal, and therefore is deemed waived. <u>See</u> <u>State v. Dorff</u>, 468 N.J. Super. 633, 639 n.3 (App. Div. 2021) (citing <u>Sklodowsky v. Lushis</u>, 417 N.J. Super. 648, 657 (App. Div. 2011)).

defendant's inquiry, stating "we [are] conducting an investigation involving narcotics" and asked if defendant "had anything on his person." Defendant told Detective Seaman that he had narcotics in his pocket. Defendant then removed a "bundle of heroin" from his pocket.[7]

Detective Seaman notified Detective MaCrae that defendant was in custody. Detective MaCrae arrived at the scene of the arrest soon after. Defendant admitted that he had additional narcotics in his apartment and consented to a search of the residence.

When police entered the apartment, they came upon co-defendant, Amanda Robinson.[8] She initially explained that she was only visiting the residence but then admitted to being in possession of seventeen "wax folds stamped American Made and two round, peach pills later identified as Eupinorfrin and Naxolone." Defendant directed the officers to his bedroom

---

[7] The detective testified that he believed defendant was not handcuffed until "after the heroin was secured from [defendant]." When questioned on cross-examination at the suppression hearing whether defendant was handcuffed when Seaman called MaCrae to advise him that defendant was in custody, Seaman testified that he believed defendant was handcuffed at that time, stating "it could have been before or after, but yes [defendant was handcuffed]."

[8] Robinson is not a party to this appeal.

where they found "several empty wax folds and six full wax folds stamped American Made."

Defendant and Robinson were then transported to the police station where each provided an electronically recorded statement. Prior to giving his statement, defendant was "read the standard Toms River Police Department Miranda form and Detective MaCrae explained the waiver portion to defendant." Defendant acknowledged that he understood his rights and waived them by signing and dating the accompanying form.

The record indicates that Detective MaCrae read verbatim the preprinted Miranda warnings and waiver provision. Neither MaCrae nor Uricks indicated during the waiver colloquy what the interrogation was about. Nor did they specify the potential criminal charges that defendant was facing. Defendant did not repeat the question he had earlier posed to Detective Seaman concerning the reason for his arrest, but nor did Detectives MaCrae or Uricks retract, amplify, or otherwise modify the answer that Seaman had given while outside defendant's apartment. It is not disputed that no arrest or complaint-warrant had been applied for or issued until after the stationhouse interrogation was concluded.

The trial judge summarized her findings concerning the stationhouse interrogation, stating:

9

defendant told police he was in a relationship with Brenda Leone and had been staying at her apartment. Defendant said he and Robinson were at the apartment on the night of May 7th. Defendant said he left the apartment and took a walk to Broad Street.

There he saw his friend Ludeman who he tried to help out. Defendant said he gave Ludeman eight bags, but did not recall if he received any money.

Defendant said when he encountered the police on May 8th he was going for a walk and had heroin on him for personal use. Defendant reiterated that he only gave heroin to Ludeman. He also stated that Ludeman had contacted him earlier that day, May 8th, and asked for the same thing.

Defendant said that while he was walking there he changed his mind and was not going to distribute heroin to Ludeman again. Defendant's cell phone was taken as evidence. When the statement concluded Detective MaCrae brought defendant a cup of water. Defendant was subsequently charged and processed.

Importantly for purposes of the issues raised on appeal, the record shows that the tenor and substance of the stationhouse interrogation changed after defendant admitted that he had given Ludeman eight bags of heroin. Detective Uricks for the first time referred to an overdose, stating "[a]nd the reason I'm here is because we investigate any kind of suspicious deaths but also deaths that involve drugs." The detective added, "we did our homework before we came here. We took statements. We've looked in phones. We've checked chats.

We've talked to Amanda. So, everything is kinda spelled out for us. As of what's goin' on right now."

As the interview continued, Detective MaCrae explained to defendant that "the reason why the Prosecutor's Office is here right now is not for eight bags of heroin we found in your pocket right . . . . This is gonna be your opportunity to try to clear the air and come clean." Detective Uricks then further stated:

> Okay, I'm from the homicide unit. Right. Because somebody died after they used some heroin last night. We have communications, right, between you and another person who's no longer with us. Right. They died. We are here. We've taken statements. We know exactly how much . . . . We know how long it took . . . . [A]nd you're gonna wear this. You're gonna wear it. It's a strict liability charge. It's a manslaughter charge brother. It means that you sold or gave . . . drugs, right, to a person that died as a result of those drugs. So, unfortunately, with what we saw inside that apartment. The only thing right now pending the autopsy that shown [sic] that they died as [sic] those bags of heroin inside the house . . . . So, it's very important and we're giving you the opportunity to say, listen I fucked up and this is who I got the drugs from. If not, the case is spelled out for us man.

The detectives then encouraged defendant to tell them who had supplied him with the drugs that he sold to Ludeman.

Defendant testified that at the outset of the interrogation, he was unaware that an overdose death occurred or that police believed he was potentially

11

A-3764-20

involved in the death. Defendant explained, "[t]hey just arrested me. And I thought I was placed under arrest for the possession [of narcotics], what was in my pocket. They never told me what I was being arrested for."

Later on May 8, 2019—the day he was arrested—defendant was charged by complaint-warrant with possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), and two counts of possession with intent to distribute a controlled dangerous substance, N.J.S.A. 2C:35-5(b)(3). The prosecutor did not apply for a complaint-warrant charging strict liability for drug-induced death.

On July 23, 2019, an Ocean County grand jury returned a ten-count indictment charging defendant with: (1) first-degree strict liability for drug-induced death, N.J.S.A. 2C:35-5 and 2C:35-9; (2) three counts of third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1); (3) three counts of third-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1), -5(b)(3), -5(b)(5); and (4) three counts of third-degree distribution of a controlled dangerous substance, N.J.S.A. 2C:35-5(a)(1), -5(b)(3), -5(b)(5). The indictment also charged Robinson with third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1).

Defendant filed a motion to suppress the admissions he made during the initial custodial interrogation outside his residence and the recorded statement he gave during the ensuing stationhouse interrogation. On August 13, 2020, the trial court convened a plenary suppression hearing at which the State and defense presented witnesses. On October 29, 2020, the trial court denied the motion to suppress, finding that defendant's statements were taken in compliance with Miranda and were given knowingly, intelligently, and voluntarily.

In reaching that conclusion with respect to the initial statement defendant made while at or near his apartment, the trial judge considered (1) defendant's prior encounters with law enforcement and his familiarity with Miranda warnings, (2) his acknowledgement that he understood his rights prior to telling law enforcement about the narcotics on his person, and (3) testimony from Detective Seaman claiming that defendant did not appear to be under the influence of intoxicating drugs when he waived his constitutional rights. The judge concluded that the State had established that "defendant knowingly and willingly waived his Miranda rights."

Regarding defendant's recorded statement at the police station, the trial judge determined that the detectives properly re-administered Miranda rights

and properly explained the waiver provision prior to posing substantive questions. A central focus of the suppression hearing was whether defendant was under the influence of intoxicating substances and thus unable to understand and waive his Fifth Amendment rights. Defendant testified that he "shot three bags of heroin into his arm just before stepping out of his apartment and was confronted by Detective Seaman." The trial judge rejected defendant's contention after reviewing the audio/video recording of the stationhouse interrogation. The judge found that defendant "appeared normal, was able to speak coherently and could communicate and respond to questions." The trial judge concluded that defendant "knowingly, intelligently and voluntarily waived his Miranda rights in answering the detective's questioning" during the stationhouse interrogation.

## II.

On June 3, 2021, defendant filed a motion for reconsideration of the trial court's denial of his motion to suppress statements, citing to the majority opinion in State v. Sims, which had been decided on February 4, 2021. 466 N.J. Super. 346, 368 (App. Div.), certif. granted, 245 N.J. 146 (2021). On July 20, 2021, the trial court granted the motion for reconsideration and suppressed defendant's

statements made during the stationhouse interrogation. In doing so, the trial judge relied on the authority and rationale of the majority opinion in Sims.[9]

The judge did not, however, reverse her decision to deny defendant's motion to suppress incriminating statements that defendant made during the initial custodial interrogation that took place outside defendant's residence. With respect to the initial custodial interrogation, the trial judge reasoned that "defendant was arrested and given his Miranda warnings. He knew he had been arrested for the bags of heroin that were found in his possession and for distribution the night before. Therefore, the initial questioning was expected." See supra note 1 (noting that defendant has not cross-appealed this portion of the trial court's suppression ruling).

The trial court reached a different conclusion with respect to the lawfulness of the stationhouse interrogation, focusing on "the progression of questioning about a drug induced death [that] could not have been known or surmised by defendant when he agreed to speak to detectives. He did not know that the woman he sold the heroin to shared it with her friend who died after

---

[9] It appears that neither the trial court nor the parties were aware that on March 16, 2021, the Supreme Court granted the State's motion to stay the Sims opinion. See infra note 13. We note that the State does not argue that the motion for reconsideration was improperly granted because defendant and the trial court relied on a published opinion that had been stayed.

ingesting it." The trial court determined that it was not until approximately "fourteen minutes into the interview" that the detectives first mentioned the "suspicious" death. The trial court found, "it is clear that the detectives believed there was probable cause to question defendant about the drug induced death and therefore should have informed defendant of the homicide investigation prior to his waiving his Miranda rights." As a result, the judge concluded that the detectives "should have informed defendant he was being questioned in connection [with] a drug induced death before defendant agreed to waive his Miranda rights."

On August 26, 2021, the State moved for leave to appeal the trial court's order suppressing the statements defendant made during the stationhouse interrogation. On that same day, the trial judge provided us with an amplified statement of reasons for granting defendant's motion for reconsideration and his motion to suppress. In the amplification letter, the trial judge explained that suppression was required "[r]egardless of how our Supreme Court decides State v. Sims . . . ." The trial judge explained,

> existing New Jersey case law and Miranda requires a knowing relinquishment of one's rights. This cannot be done if an arrestee, in custody, interrogated by law enforcement is not advised of the most serious charge

that the questioner believes the arrestee committed.[10] This is especially so when the arrestee cannot know or is unlikely to know about what crimes they are being questioned.

The trial judge further explained in her amplification letter that

[d]efendant was not advised that anyone had died from the drugs he sold until after he waived his rights and after 18 minutes of questioning. It is not just what defendant was told or not told as to why he was being questioned, but when he was told. Because defendant should have been told a[t] the beginning of the interview; his waiver was not knowingly given.

---

[10] Although the trial judge suggested in the amplification letter that her decision was made "regardless of how our Supreme Court decides [Sims]," the judge's ensuing description of "existing New Jersey case law" essentially restates the new categorical rule that the majority announced in Sims. In Sims, the majority held that "without being correctly informed of the crime for which he [or she] was arrested, a defendant cannot knowingly and intelligently waive his [or her] right against self-incrimination." 466 N.J. at 354. We note the majority in Sims acknowledged in the opening sentence of its opinion that it was addressing a question of first impression. Ibid. The majority explained,

This appeal requires us to determine as a matter of first impression whether the Supreme Court's holdings in State v. A.G.D., 178 N.J. 56 (2003), and State v. Vincenty, 237 N.J. 122 (2019), requiring that police inform a defendant subject to custodial interrogation of specific charges filed against him before he can waive his Miranda rights, also apply to an interrogee who was arrested and questioned prior to any charges being filed, where the arrest was based upon information developed through an earlier police investigation.

[Ibid.]

We granted the State's motion for leave to appeal on August 27, 2021.

The State raises the following contentions for our consideration:

POINT II[11]

THE COURT ERRED IN EXTENDING THE HOLDING OF THE DECISION IN STATE V. SIMS TO INCLUDE THE NECESSITY TO INFORM A SUSPECT OF THE FACTS OF AN INVESTIGATION TO WHICH HE IS MERELY A SUSPECT WHEN ARRESTED ON OTHER CHARGES.

The State raises the following additional contention in its reply brief:

POINT I

THE COURT'S ORDER SUPPRESSING THE DEFENDANT'S STATEMENT WAS IN ERROR BECAUSE THE DEFENDANT WAS AT ALL TIMES INFORMED OF HIS "TRUE STATUS" IN ACCORD WITH STATE V. A.G.D., STATE V. VINCENTY, AND STATE V. SIMS.

III.

We begin our analysis by acknowledging certain foundational legal principles governing this appeal. When reviewing a grant or denial of a motion

---

[11] The State's appellate motion brief also served as its merits brief. The first point in the State's brief pertains to the reasons for granting leave to appeal the trial court's interlocutory suppression order and is no longer relevant in light of our decision to grant leave to appeal.

A-3764-20

to suppress a statement, we apply a deferential standard of review to the trial court's findings of fact. State v. S.S., 229 N.J. 360, 379–80 (2017). We accept the trial court's factual findings unless they are not supported by sufficient credible evidence in the record. Id. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)). In contrast, we review the trial court's legal conclusions de novo. Id. at 380. Accordingly, we are not bound by a trial court's interpretations of the legal consequences that flow from established facts. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); State v. Harris, 457 N.J. Super. 34, 43–44 (App. Div. 2018); see also State v. Handy, 206 N.J. 39, 45 (2011) (noting that whether established facts warrant suppression is a "purely . . . legal question" subject to plenary review).

Turning to the substantive constitutional principles pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381–82 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically

triggering the Fifth Amendment privilege against self-incrimination." State v.

P.Z., 152 N.J. 86, 102 (1997) (citing Miranda, 384 U.S. 436). Consequently,

> when a person in police custody is questioned by law enforcement, he [or she] must be told that he [or she] has the right to remain silent, that any statement he [or she] makes may be used against him [or her], that he [or she] has the right to an attorney, and that if he [or she] cannot afford an attorney, one will be provided for him [or her].
>
> [Ibid. (citing Miranda, 384 U.S. at 444).]

As the New Jersey Supreme Court recently explained in State v. Tillery,

"Miranda imposes a fifth requirement: 'that a person must be told that he [or she]

can exercise his [or her] rights at any time during the interrogation.'" 238 N.J.

293, 315 (2019) (quoting Miranda, 384 U.S. at 479).

Importantly for purposes of this appeal, the New Jersey Supreme Court

affords interrogees additional rights beyond those guaranteed under federal

constitutional law. In Vincenty, our Supreme Court recently reaffirmed that the

"[New Jersey] common law privilege against self-incrimination affords greater

protection to an individual than that accorded under the federal privilege." 237

N.J. at 132 (quoting In re Grand Jury Proc. of Guarino, 104 N.J. 218, 229

(1986)). The Court added

> We have provided that protection because the right against self-incrimination is "an integral thread in the

fabric of [the] common law," and "one of the most important protections of the criminal law[.]" Accordingly, we maintain "an unyielding commitment to ensure the proper admissibility of confessions."

[Ibid. (quoting State v. Hartley, 103 N.J. 252, 286 (1986); then quoting State v. Presha, 163 N.J. 304, 312 (2000); and then quoting State v. Reed, 133 N.J. 237, 252 (1993)).]

Notably, in A.G.D., the Court expanded the list of familiar Miranda warnings, holding that police must inform the interrogee that a criminal complaint has been filed or an arrest warrant has been issued. 178 N.J. at 58–59. The Court explained,

[w]ithout advising the suspect of his [or her] true status when he [or she] does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support [the] confession's admission.

[Id. at 68.]

In Vincenty, the Court amplified the obligation established in A.G.D. to advise an interrogee of his or her "true status," explaining that police interrogators must "make a simple declaratory statement at the outset of an interrogation that informs a defendant of the essence of the charges filed against him [or her]." 237 N.J. at 134 (emphasis added). Accordingly, it is not enough for police to advise an interrogee of the fact that an arrest warrant or complaint-

21

warrant has been issued; the suspect must be informed of the nature and seriousness of the charges that have been filed.

Assuming that Miranda warnings are properly administered, a defendant subject to custodial interrogation "may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." Tillery, 238 N.J. at 315 (quoting Miranda, 384 U.S. at 444). Under New Jersey's custodial interrogation jurisprudence, and consistent with our Supreme Court's commitment to afford protections beyond those guaranteed under federal law, for an incriminating statement obtained during a custodial interrogation to be admissible, "the prosecution [must] 'prove beyond a reasonable doubt that the suspect's waiver [of Miranda rights] was knowing, intelligent, and voluntary in light of all the circumstances.'" State v. A.M., 237 N.J. 384, 397 (2019) (quoting Presha, 163 N.J. at 313). The case before us focuses on whether the State has proved beyond a reasonable doubt that defendant's waiver of Miranda rights was made knowingly.

As our Supreme Court recently reaffirmed, we evaluate whether the State has satisfied its burden of proof by considering the "totality of the circumstances." Tillery, 238 N.J. at 316 (quoting A.M., 237 N.J. at 398). The totality of the circumstances includes "both characteristics of the defendant and

the nature of the interrogation." State v. Baylor, 423 N.J. Super. 578, 588 (App. Div. 2011) (quoting State v. Knight, 183 N.J. 449, 462 (2005)).

In Nyhammer, the Court

> emphasized that Miranda does not require that "the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights" because "the additional information could affect only the wisdom of a Miranda waiver, not its essentially voluntary and knowing nature." [Colorado v. Spring, 479 U.S. 564, 576–77 (1987)] . . . . Thus, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision." Id. at 576.
>
> [197 N.J. at 407.]

In A.M., the Court recently reaffirmed this important principle. 237 N.J. at 398 (quoting Nyhammer, 197 N.J. at 407).

However, and of particular importance in this appeal, the Court in Nyhammer stressed, "'evidence that the accused was threatened, tricked, or cajoled into a waiver' of his [or her] privilege will render the waiver involuntary." Id. at 407 (emphasis added) (quoting Miranda, 384 U.S. at 476); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (emphasis added) (noting that a waiver is voluntary when it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception").

In Sims, the majority of the Appellate Division panel announced a new prophylactic rule that when police make an arrest following an investigation, they must at the outset of a custodial interrogation advise the interrogee of the offense(s) for which he or she was arrested regardless of whether a complaint-warrant or arrest warrant has been issued. 466 N.J. Super. at 367. The majority concluded that when a custodial interrogation follows an investigation, a defendant is "entitled to be informed of the charge for which he [or she] [is] being placed under arrest before deciding whether to waive his [or her] right against self-incrimination." Ibid. The majority reasoned that a new categorical rule is necessary "because without being correctly informed of the crime for which he [or she] was arrested, a defendant cannot knowingly and intelligently waive his [or her] right against self-incrimination."[12] Id. at 354.

---

[12] The majority in Sims noted,

> our holding is limited to requiring that the interrogating officer inform the arrested interrogee of the charge that, at the time of arrest, the officer had probable cause to believe defendant committed. We recognize that the charge may morph into a different degree crime or even a totally different offense as a post-interrogation investigation develops. We still conclude the law requires an officer be transparent and truthful about why a defendant was arrested before a request is made for a waiver of his or her Miranda rights.

In practical effect, the majority adopted a new <u>Miranda</u> warning/advisement, as our Supreme Court had previously done in <u>A.G.D.</u> and <u>Vincenty</u>. The majority did not hold that the failure to advise the interrogee of the charge for which he or she was arrested is merely a factor to be considered as part of the totality of the circumstances in determining whether a waiver was made knowingly. Rather, the majority announced a new prerequisite to custodial interrogation without which an ensuing statement would automatically be deemed to be inadmissible. <u>Miranda</u> and its progeny, it bears noting, establish a per se rule in the sense that the failure by police interrogators to deliver any of the required warnings/advisements automatically results in the suppression of an ensuing statement. <u>See</u> <u>State v. Carty</u>, 170 N.J. 632, 649 (2002) (citing <u>Miranda</u>, 384 U.S. at 479) ("[F]ailure to give [<u>Miranda</u>] warnings creates an irrebuttable presumption of compulsion as to use of unwarned statements in the State's case-in-chief.").

The New Jersey Supreme Court granted certification in <u>Sims</u> and heard oral argument on October 12, 2021. The question to be addressed in that appeal is: "[w]ere the officers required to advise defendant, who was not charged with

[<u>Id.</u> at 368 n.7.]

any offenses at the time, why he was arrested before proceeding with the custodial interrogation." State v. Sims, No. A-53-20. As we have already noted, see supra note 9, the Court granted the State's motion to stay the Appellate Division's published opinion.[13] It is thus uncertain whether the majority opinion has any precedential force pending the Supreme Court's announcement of its decision. Nor did the majority in Sims address whether and in what circumstances the new per se rule should be applied retroactively.

IV.

Based on our assessment of the totality of the relevant circumstances, we affirm the suppression of defendant's incriminating statements made during the stationhouse interrogation. We do so not because the detectives violated the per se rule announced in Sims. Given the procedural posture of that case, it is for the Supreme Court, not us, to decide whether police must at the outset of a

---

[13] The State's motion was captioned to stay the Appellate Division February 4, 2021 opinion and not just to stay the order for a new trial in that case. The State argued in its motion brief that, "a stay is necessary to prevent irreparable harm to the State in pending investigations and prosecutions throughout the State." The Supreme Court's March 16, 2021, order provides in pertinent part, "[i]t is ORDERED that the motion for stay is granted pending the Court's consideration of the State's petition for certification and appeal." We therefore presume the effect of the Court's one-line order is to stay the majority opinion, thereby holding the new rule of law governing the administration of Miranda warnings in abeyance pending the Supreme Court's resolution of the case.

26

custodial interrogation automatically advise an interrogee of the most serious offense for which there is probable cause to arrest when, as in this case, no arrest warrant or complaint-warrant has been issued by a judge. In this instance, we need not rely upon any such categorical expansion of the <u>Miranda</u> warnings to affirm the suppression of defendant's incriminating statements. Rather, we follow an alternate analytical route. We focus on whether the State proved beyond a reasonable doubt that defendant knowingly waived his right against self-incrimination in view of the detectives' stratagem to withhold the fact that someone had died following defendant's act of distributing heroin to Ludeman.

Specifically, we conclude that the detectives in this case affirmatively misled defendant as to his "true status," <u>cf.</u> <u>A.G.D.</u>, 178 N.J. at 68, by providing a deliberately vague and incomplete answer to his question as to the reason why he was taken into custody. The record before us shows that the detectives were pursuing an investigative stratagem to withhold information concerning the overdose death until after defendant had admitted selling heroin to Ludeman the day before. The reasonably likely if not intended effect of that artifice was to lead defendant—at the critical moment he waived his Fifth Amendment rights— to believe that he had been arrested for a less serious offense than strict liability homicide.

It is one thing for police to withhold information. It is another thing entirely for them to provide an explanation that creates or reinforces a false impression as to the seriousness of the sentence that a defendant is facing. Any such deception or trickery as to the true reason a defendant is taken into custody, whether made in response to a question posed by the defendant, as in this case, or made on the police interrogator's own initiative, is an important circumstance to be considered as part of the totality of circumstances when determining whether the State has proved beyond a reasonable doubt that the defendant made a knowing and voluntary waiver of the right against self-incrimination. Cf. State v. L.H., 239 N.J. 22, 47–48 (2019) (noting that minimizing the seriousness of the crimes under investigation is a relevant factor under the totality of circumstances test).

As we explained in our recitation of the pertinent facts, during the first custodial interrogation event conducted outside defendant's residence, defendant asked Detective Seaman "what [this] was about." Detective Seaman told defendant, "we [are] conducting an investigation involving narcotics." Applying an objective standard, we believe a reasonable person in these circumstances would interpret the detective's response to mean, as defendant

28

believed, that he had been taken into custody for possessing and distributing drugs, not for committing a homicide.

The answer that Detective Seaman provided was the truth, but not the whole truth.[14] The detective was stationed outside defendant's residence in anticipation that, as instructed by police, Ludeman would invite defendant to her apartment to consummate another drug transaction. Detective Seaman was there to surveil defendant's residence and intercept him when he left to go to Ludeman's apartment. Seaman was in direct communication with Detective MaCrae, who was listening in on the telephone call Ludeman placed to defendant.

Clearly, this was a carefully orchestrated warrantless arrest as part of the ongoing homicide investigation.[15] We recognize that police are permitted to

---

[14] We note that one of the material elements of the strict liability for drug-induced death offense is that the person "manufacture[], distribute[] or dispense[] [a specified controlled dangerous substance or analog] in violation of N.J.S. 2C:35-5 . . . ." N.J.S.A. 2C:35-9.

[15] We note that by waiting to arrest defendant until after he had left his residence, the detective was not required to obtain an arrest warrant before taking defendant into custody. See New York v. Payton, 445 U.S. 573 (1980) (holding a routine felony arrest cannot be effected in the arrestee's own home without an arrest warrant or an exception to the warrant requirement, such as exigent circumstances or consent); see also Kirk v. Louisiana, 536 U.S. 635 (2002) (reaffirming the strict Payton rule).

make a lawful arrest notwithstanding that their ulterior purpose for doing so is to investigate a different offense. In State v. Bruzzese, for example, our Supreme Court held that the detective acted reasonably in going to the defendant's home to arrest him for an outstanding municipal court warrant for contempt notwithstanding that the true reason for executing the arrest warrant at defendant's home was to provide an opportunity to investigate a burglary unrelated to the bench warrant. 94 N.J. 210, 227–228 (1984).

In this instance, during the stationhouse interrogation, Detective MaCrae acknowledged that the law enforcement plan was not designed merely to intercept defendant in possession of a small quantity of heroin. Rather, the planned arrest was intended to advance the overdose death investigation. Indeed, it is evident that the plan was to intercept defendant and take him to the police station for interrogation. Detective Seaman testified in this regard that he administered Miranda warnings even before defendant was handcuffed because defendant "was going to be questioned."

We also recognize that Detective Seaman's circumscribed explanation as to the reason for the arrest was provided during the first custodial interrogation event after defendant had initially waived his Miranda rights but before he was asked any substantive questions about criminal activity. Defendant did not

repeat his question during the stationhouse interrogation that occurred shortly thereafter. We believe the start of a new interrogation session and the administration of fresh Miranda warnings did not wipe the slate clean. Rather, the impact of Detective Seaman's deliberately vague and incomplete answer continued unabated well into the stationhouse interrogation. The detective's misleading explanation of the reason for defendant's arrest was not rectified until after defendant had made incriminating statements at the police station. In these circumstances, for purposes of resolving whether defendant knowingly waived his right against self-incrimination, we believe the stationhouse interrogation was essentially a continuation of the initial custodial interrogation that took place outside defendant's residence. Cf. Hartley, 103 N.J. at 284 (finding that a second statement was given "on the heels of—if not in tandem with" an initial statement and also recognizing Leyra v. Denno, 347 U.S. 556 (1954), for the proposition that "the confessions were inadmissible because the relation of the confessions was so close that one must say the facts of one controlled the character of the other; they were all parts of one continuous process.").

We add that the re-administration of Miranda warnings at the police station, while clearly required as a matter of law, did not rectify the misleading answer that Detective Seaman had given to defendant outside his residence. If

31

anything, the detectives reinforced the false impression created by Detective Seaman's incomplete answer by saying nothing more about the reason for the defendant's arrest during the second <u>Miranda</u> waiver colloquy at the police station. A reasonable person in defendant's position would have no reason to believe that the fundamental nature of the investigation and reason for his arrest had changed since he was first told that police were "conducting an investigation involving narcotics."

V.

Our review of the electronically recorded stationhouse interrogation viewed in context with the ongoing overdose death investigation leads us to the conclusion that the detectives were following a deliberate investigative strategy to withhold information about the overdose death from defendant until after he admitted that he sold heroin to Ludeman the day before. We note that as part of the investigative plan, the detectives had instructed Ludeman to ask defendant for "the same stuff" he had distributed the night before. No doubt the detectives hoped to apprehend defendant in possession of the same labeled brand of heroin he had previously sold to Ludeman, corroborating her statement. But the police-orchestrated telephone conversation would also reasonably lead defendant to believe that nothing untoward had happened following his prior distribution to

32

Ludeman. The interrogation strategy was designed to keep defendant from realizing that he faced possible prosecution for homicide and the lengthy sentence associated with a first-degree No Early Release Act[16] crime until after he had waived his right against self-incrimination and made incriminating admissions that would support a homicide prosecution.

In reaching that conclusion, we recognize that as a general matter, we use an objective test to evaluate the constitutionality of police conduct,[17] and do not inquire as to an officer's subjective intent. There is important precedent, however, for the proposition that a reviewing court may consider whether police used a stratagem designed to induce a defendant to yield his or her Fifth Amendment rights. In Brewer v. Williams, the United States Supreme Court

---

[16] The No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, requires that a person convicted of a designated first- or second-degree crime serve 85% of the sentence imposed before becoming eligible for parole. The strict liability for drug-induced death offense is a designated NERA crime. N.J.S.A. 2C:43-7.2(d)(15).

[17] Under Fourth Amendment analysis, for example, reviewing courts apply an objective test of reasonableness to evaluate police conduct. See State v. Gonzales, 227 N.J. 77, 82 (2016) (eliminating the inadvertence requirement for the plain view exception to the warrant requirement based in part on the strong preference for objective standards of reasonableness, as inadvertence analysis calls for a subjective inquiry into an officer's motivation); see also Bruzzese, 94 N.J. at 219 (noting that the Fourth Amendment proscribes unreasonable actions, not improper thoughts, and rejecting a "bad faith doctrine").

addressed whether detectives had conducted an "interrogation" while transporting the defendant after he had invoked his right to counsel, thereby precluding any further custodial interrogation. 430 U.S. 387, 398–401 (1977). The officers delivered the now-famous "Christian burial speech" as a stratagem to induce Brewer to reveal where the child victim's body was buried—information only the killer would know. Id. at 400. Although the officers did not pose any questions to Brewer, the Court concluded that the officer's conversation in his presence was "tantamount to interrogation." Id. at 399–400. In reaching that conclusion, the Court explained, "[t]here can be no serious doubt . . . that [the detective] deliberately and designedly set out to elicit information from [the defendant] . . . ." Id. at 400; see also Rhode Island v. Innis, 466 U.S. 291, 305 (1980) (Marshall, J., dissenting) (emphasis added) ("[W]here a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.").

We emphasize that under the analytical approach we follow in this case, we do not focus on the detectives' subjective intent but rather on the reasonably likely impact of their overall conduct on defendant's understanding of his true status and predicament. The ultimate question under this analytical paradigm is

not whether the detectives violated the per se <u>Miranda</u> rule, but rather whether, considering all relevant circumstances, defendant knowingly and voluntarily waived his <u>Miranda</u> rights applying the rigorous proof-beyond-a-reasonable-doubt standard.

In this case, an objective assessment of the detectives' actions leads us to conclude that the decision to withhold information about the overdose death—manifested in Detective Seaman's incomplete answer to defendant's question—was part of a deliberate and designed investigative plan to induce defendant to waive his right against self-incrimination. On these facts, we need not delve into the detectives' subjective thoughts to reach this conclusion. The strategic decision to disguise the true nature of the investigation until after defendant had waived his <u>Miranda</u> rights and made incriminating statements was revealed when a detective eventually told defendant he was assigned to the homicide unit and explained, "the reason why the Prosecutor's Office is here right now is not for eight bags of heroin we found in your pocket . . . ." It was only at that point, approximately fifteen minutes after defendant had waived his <u>Miranda</u> rights and shortly after defendant confessed to selling drugs to Ludeman the day before, that defendant learned of the true jeopardy he faced. The trial judge aptly remarked in her written opinion, "[i]t is not just what defendant was told

or not told as to why he was being questioned, but when he was told. Because defendant should have been told a[t] the beginning of the interview; his waiver was not knowingly given."

We recognize that police are permitted, within limits, to use trickery or deception in the course of a custodial interrogation. See State v. Patton, 362 N.J. Super. 16, 31–41 (App. Div. 2003) (acknowledging that police are permitted the use of trickery in interrogations but drawing the line at fabricating physical evidence); State v. Manning, 165 N.J. Super. 19, 30–31 (App. Div. 1978) (quoting Wharton, Criminal Evidence § 685 at 471–74 (13th ed. 1973)) (upholding the admission of a confession given after police lied to defendant that his co-defendant had already confessed, noting "[a] confession induced by deception or trickery is not inadmissible unless the method used was calculated to produce an untruthful confession or was offensive to due process."), rev'd on other grounds, 82 N.J. 417 (1980); Baylor, 423 N.J. Super. at 588–89 (citing Manning, 165 N.J. Super. at 30–31) (upholding the trial court's finding that although the police engaged in some deception about the evidence and witnesses against the defendant, that trickery did not result in defendant making a statement he would not have otherwise made voluntarily).

We draw a fundamental distinction between police trickery with respect to the strength of the evidence against an interrogee on the one hand, and trickery with respect to an interrogee's "true status" within the meaning of A.G.D, 178 N.J. at 68, on the other hand. Misleading a defendant about the seriousness of the offense(s) for which he or she was arrested is, in our view, qualitatively different from misleading a defendant about factual evidence of his or her guilt. Stated differently, police are allowed to use certain forms of trickery while posing substantive questions following a knowing and voluntary Miranda waiver. Such trickery is designed to induce an interrogee who has already waived his or her Miranda rights to make factual statements that constitute incriminating admissions. We are aware of no precedent, however, that authorizes trickery as part of the waiver process, that is, trickery designed to induce a person to yield his or her right to remain silent and consult with an attorney before answering substantive questions. Indeed, Miranda itself explains to the contrary that "any evidence that the accused was . . . tricked . . . into a waiver will, of course, show that the defendant did not voluntarily waive his [or her] privilege." 384 U.S. at 476.

We have little tolerance for the form of deception that occurred in this case. Affirmatively misleading an interrogee about the seriousness of the

offense for which he or she was taken into custody strikes at the heart of the waiver decision. We note in this regard that, in A.G.D., the police told the defendant he was not under arrest even though they were in possession of a complaint-warrant. The Court held that

> [the] defendant was disadvantaged by a lack of critically important information. The government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights.
>
> [178 N.J. at 68.]

Our Supreme Court's decision in State v. Cooper underscores the reason for our concern. 151 N.J. 326 (1997). The Court in that case explained that although courts should consider misrepresentations made by police officers when analyzing the totality of the circumstances, "misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge." Id. at 355 (citation omitted). The purpose for the misrepresentation by omission in that case, however, was markedly different from the misrepresentation by omission that occurred in the present matter. In Cooper, the detective told the defendant that "the person that did this would be charged with murder and would be facing life imprisonment with a minimum of thirty years [without] parole." Id. at 353. The detective acknowledged at the

38

suppression hearing that he had not informed defendant that the death penalty

was a potential punishment for the murder.  Id. at 354.  The Supreme Court

determined that

> [t]he statement by [the detective] is not entirely inaccurate.  As the State emphasizes, the ordinary sentence for murder is life imprisonment with thirty years of parole ineligibility. N.J.S.A. 2C:11-3(b).  The death penalty only comes into play when the prosecutor, not police officers, charges a death-eligible form of murder under N.J.S.A. 2C:11-3(c), and submits notice of at least one aggravating factor.  N.J.S.A. 2C:11-3(c)(2)(e); R. 3:13-4(a).  Although a police officer may suspect that the murder will be death-eligible, the officer has no way of knowing for sure.
>
> [Id. at 355.]

The Court added,

> The totality of the circumstances involved more than a statement about potential sentences.  [The detective] also informed defendant about the investigatory steps that were being taken to tie him to the murder.  Considered as a whole, the statement that induced defendant to confess was not a promise of "mere" life imprisonment, but rather an attempt to convey to defendant the seriousness of the offense, the seriousness of the sentence that he was facing, and the strong case that the police officers were building against him.  Although the statements by the police might have included some puffery, they were, as the trial court described them, "factual."
>
> [Id. at 355–56 (emphasis added).]

Here, in stark contrast, the detective's omission in response to defendant's question was by no means "an attempt to convey to defendant the seriousness of the offense" that he was facing. Ibid. Quite the contrary, the failure to mention the overdose death and defendant's potential exposure to a first-degree NERA sentence for strict liability for drug-induced death was designed or reasonably likely to convey to defendant that he was facing a significantly less serious sentence than he actually faced.

In reaching our conclusion, we do not propose a categorical, per se rule that any deception or trickery of this type automatically warrants suppression. See id. at 355 ("Misrepresentations alone are usually insufficient to justify a determination of involuntariness or lack of knowledge."). Rather, we hold that such deception is an important factor to be considered as part of the totality of the circumstances in determining whether the State has met its heavy burden of proving beyond a reasonable doubt that the defendant made a knowing waiver of the right against self-incrimination. See id. at 355–56.

## VI.

We next address the State's argument that the detectives were under no obligation to inform defendant about the drug overdose death—even under the new Miranda rule announced by the majority in Sims— because they did not

have probable cause to charge defendant with the strict liability for drug-induced death offense pending the completion of autopsy and toxicology reports.[18]  We are not persuaded by this argument.  We acknowledge that the detectives at the time of the stationhouse interrogation may not have intended to seek permission to apply for a complaint-warrant charging a violation of N.J.S.A. 2C:35-9.  See infra note 19 (explaining that an assistant prosecutor or assistant or deputy attorney general must approve an application for a complaint-warrant charging an indictable crime).  We nonetheless are satisfied that at the time defendant was taken into custody, the detectives were aware of facts that, viewed collectively, would lead an objectively reasonable police officer to believe that defendant was criminally responsible for the victim's death.  While autopsy and toxicological evidence to confirm that Baita's death was a result of a heroin overdose may well be needed to prove the N.J.S.A. 2C:35-9 offense at trial beyond a

---

[18]  We note that in Nyhammer, the Court expressly declined to require police to advise an interrogee of his or her "suspect status" in part because that status in "not an objectively verifiable and discrete fact," but rather is an "elusive concept that will vary depending on subjective considerations of different police officers."  197 N.J. at 405.  In view of the clear rule established in Nyhammer, we do not mean to suggest in this opinion that the detectives were required to advise defendant that he was a suspect in their overdose death investigation, although it could hardly be disputed that was true.  Rather, we agree with the State that the critical fact-sensitive issue is whether the detectives had probable cause to believe that defendant committed a violation of N.J.S.A. 2C:35-9.

41

reasonable doubt, in these circumstances, and especially considering the information supplied by Ludeman, such forensic evidence was not needed to meet the far lower probable cause standard of proof. We believe there was adequate, indeed ample evidence known to the detectives to support a reasonable inference that Baita died of a drug overdose after ingesting the heroin that defendant sold to Ludeman shortly before the victim's tragic death.

In State v. Basil, our Supreme Court acknowledged that probable cause "cannot be defined with scientific precision" because it is "based on factual and practical considerations of . . . reasonable [individuals], not legal technicians . . . ." 202 N.J. 570, 585 (2010) (first quoting State v. Evers, 175 N.J. 355, 381 (2003); and then quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)); see also State v. Wilson, 178 N.J. 7, 13 (2003) (noting that probable cause does not have a precise definition). Probable cause has been described as "a fluid concept— turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." Basil, 202 N.J. at 585 (quoting Gates, 462 U.S. at 232). Significant to the resolution of this appeal, however, is that although probable cause "is more than a mere suspicion of guilt, it is [also] less than the evidence necessary to convict a defendant of a crime in

a court of law."  Ibid. (citing Brinegar v. United States, 338 U.S. 160, 175 (1949)).

In State v. Moore, the Court explained "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt."  181 N.J. 40, 46 (2004) (quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)).  In assessing whether probable cause exists, courts "must look to the totality of the circumstances[] and view those circumstances from the standpoint of an objectively reasonable police officer."  State v. Gibson, 218 N.J. 277, 293 (2014) (citing Basil, 202 N.J. at 585).  Ultimately, "[p]robable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed."  Moore, 181 N.J. at 46 (alterations in original) (quoting Schneider v. Simonini, 163 N.J. 336, 361 (2000)).

We reiterate that it is highly relevant that the detectives in this case had the benefit of a cooperating witness, Ludeman.  "In assessing the facts available to a police officer, important considerations are the witness's veracity, reliability, and basis of knowledge.  Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than

43

information received from an anonymous tipster." Basil, 202 N.J. at 586 (citations omitted).

Applying these general principles, we believe that even before defendant made his incriminating admissions, the detectives had "a reasonable ground for belief of guilt" that defendant supplied the heroin that caused Baita's death. Moore, 181 N.J. at 46 (2004) (quoting Pringle, 540 U.S. at 371). We agree with the trial court that Detective Uricks' summation of the incriminating evidence that was presented to defendant during the stationhouse examination shows that the detectives had probable cause to link defendant to the death. Detective Urick's summation included an acknowledgment that an autopsy was pending but also a comment that "[s]o, everything is kinda spelled out for us." He also told defendant "you sold or gave . . . drugs, right, to a person that died as a result of those drugs." (emphasis added). Those comments were based on information the detectives had already learned during their investigation and were not mere "puffery," to borrow the phrase used by the Court in Cooper. 151 N.J. at 356.

Our de novo review of the record shows that the detectives, prior to the stationhouse interrogation, had reliable information that (1) defendant communicated with Ludeman regarding a drug deal on May 7, 2019, via Facebook Messenger; (2) defendant went to Ludeman's apartment to complete

the transaction; (3) Ludeman gave four out of the eight bags of heroin she purchased from defendant to her roommate, Baita; (4) Ludeman was rendered unconscious for several hours after injecting the heroin that had been supplied by defendant, suggesting the potency of that product; (5) Ludeman found Baita dead when Ludeman woke up after ingesting the heroin defendant supplied; (6) Ludeman told police she believed Baita's death was a drug overdose; (7) Ludeman handed over to police two bags of heroin marked "American made" in red ink that she had given to Baita and that were found among Baita's possessions; (8) Ludeman agreed to a consensual intercept of a telephone conversation between her and defendant during which, as per police instruction, Ludeman invited defendant to return to her apartment to sell additional heroin; (9) the detectives overheard that defendant agreed to come immediately to Ludeman's apartment to sell more heroin to her and a fictitious person; (10) immediately after the consensually-intercepted telephone call concluded, defendant left his residence and was apprehended; (11) defendant was carrying eight bags of heroin on his person; and (12) additional folds of heroin marked "American made" in red ink were found in defendant's apartment, further corroborating Ludeman's information and credibility. Considering the totality of the circumstances, we conclude that detectives had "more than a mere

45

suspicion of guilt" that defendant had supplied drugs that were reasonably connected to Baita's death. See Basil, 202 N.J. at 585.

The State argues that the trial court acknowledged that law enforcement did not have probable cause until the autopsy and toxicology reports were completed. Specifically, the trial court stated,

> Well, maybe there wasn't sufficient probable cause for —for the arrest warrant or the—the warrant to actually issue. But—but all that was—all they were waiting on there was the autopsy, the medical—the medical examiner's findings from the autopsy, and the toxicology.

We do not interpret this portion of the trial court's remarks as a definitive finding that police did not have probable cause to arrest for violation of N.J.S.A. 2C:35-9. For one thing, the trial court's statement from the motion for reconsideration hearing is taken out of context. The State fails to acknowledge that the trial judge went on to recount other pieces of information that supported probable cause, such as the information from Ludeman about the drug deal and the bags of heroin found at defendant's apartment. The State also fails to recognize that the trial court ultimately determined, in its written decision, "the detectives had probable cause to believe defendant" was connected to Baita's death.

46

Furthermore, the judge ultimately rejected the prosecutor's argument that the detectives were not required to inform defendant of the overdose death because the autopsy and toxicology reports had not yet been completed. The judge in her written opinion described the State's argument as "disingenuous," noting, "[m]anslaughter and murder suspects are routinely told of the crimes they are suspected of before autopsy and toxicology reports are received. First degree strict liability drug induced death should be treated no differently when law enforcement has all the facts to support the charge except for [these reports]."

In any event, as we have noted, we review de novo whether the probable cause standard has been met. Ornelas v. United States, 517 U.S. 690, 699 (1996) ("[A]s a general matter[,] determinations of . . . probable cause should be reviewed de novo on appeal."); see also State v. Hubbard, 222 N.J. 249, 263 (2015) ("A trial court's legal conclusions are reviewed de novo."). We stress that we use an objective "reasonable officer" test to determine whether probable cause existed at the time of the custodial interrogation.

In this case, the prosecutor in the exercise of discretion chose not to apply for a complaint-warrant charging defendant with a violation of N.J.S.A. 2C:35-9. Rather, this offense was first charged by means of a grand jury indictment.

47

It was the prosecutor's prerogative, of course, to present the case to the grand jury only after receiving the autopsy and toxicology reports.[19]  That decision does not mean that the detectives at the time of defendant's arrest and interrogation were not aware of facts constituting probable cause to believe he committed the strict liability homicide offense, viewed "from the standpoint of an objectively reasonable police officer."  Gibson, 218 N.J. at 293.  Nor does the prosecutor's election to refrain from applying for a complaint-warrant charging N.J.S.A. 2C:35-9 render irrelevant the strategic decision to deliberately withhold information about the overdose death when explaining to defendant why he had been taken into custody.  Were it otherwise, police and prosecutors

_____

[19]  To ensure the uniform implementation of the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, in October 2016 the Attorney General issued a directive to the law enforcement community that generally provides that applications for complaint-warrants involving indictable crimes must be reviewed and approved by an assistant prosecutor or assistant or deputy attorney general before being submitted to a judge.  See generally Attorney General, Law Enforcement Directive No. 2016-1 (Feb. 17, 2016).

We note that in this instance, a county prosecutor detective participated in the stationhouse investigation, indicating that the overdose death investigation and not just the charging decision was under the auspices of the prosecutor's office.  See also supra note 4 (noting that under the Wiretap Act, the consensual interception of Ludeman's telephone conversation with defendant required the approval of the Attorney General or his or her designee or a county prosecutor or his or her designee).

could avoid the impact of failing to explain a defendant's true predicament simply by choosing not to charge the most serious offense by complaint-warrant.

## VII.

As we have stressed throughout this opinion, we do not affirm the trial court's suppression ruling because the detectives violated the new per se rule announced by the majority in <u>Sims</u>. We leave to the Supreme Court to decide whether to adopt the rationale of the <u>Sims</u> majority and if so, whether and in what circumstances that rule applies retroactively. Accordingly, we do not decide whether police may remain silent during a <u>Miranda</u> waiver colloquy with respect to the essence of unfiled charges for which the interrogee was taken into custody. Rather, we focus on the impact of the police decision in this instance to advise defendant of the reason for his arrest in a manner that was vague and misleading. We affirm the suppression of defendant's incriminating admissions made during the stationhouse interrogation because the detectives deliberately and affirmatively misled him as to the potential sentencing consequences of his waiver of the right against self-incrimination, leading us to conclude that the State failed to prove beyond a reasonable doubt that defendant's waiver of his right against self-incrimination was made knowingly.

49

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3764-20